FIDELITY MUTUAL LIFE INSURANCE COMPANY *v.* EMMA S. MIAZZA.*

FIRST [46 South., 817.] APPEAL.

1. LIFE INSURANCE. *Contract. Construction. Law governing. Laws,* 1902, *p.* 66, *ch.* 59, *sec.* 14.

> A policy of life insurance, issued on the life of a resident of this state, under laws 1902, p. 66, ch. 59, sec. 14, so providing, though made in another state, must be construed according to the laws of this state regardless of a provision in the policy to the contrary.

2. SAME. *Application. Misrepresentations. Effect. Material. Immaterial.*

> A positive statement in an application for insurance, material to the risk, will, if false, avoid the policy issued on the faith of it, although the applicant may have believed the statement true; but a misstatement therein, wholly immaterial to the risk, cannot be made material by the terms of the policy and will not avoid it.

3. SAME. *Evidence. Case.*

> Evidence touching an alleged misrepresentation of the health of the insured examined and adjudged to have required its submission to a jury.

---

* A second decision of the same case on a second appeal, affirming a judgment in Mrs. Miazza's favor, is reported in this volume, *post* ——.

From the circuit court of, first district, Hinds County.

Hon. Robert L. Bullard, Judge.

Mrs. Miazza, appellee, was plaintiff in the court below, the insurance company, appellant, was defendant there. From a judgment in plaintiff's favor, predicated of a peremptory instruction, the defendant appealed to the supreme court.

The facts are stated in the opinion of the court.

*F. H. Calkins, Alexander & Alexander* and *George B. Power,* for appellant.

Can it be said, as a matter of law, that the concealment by Miazza of the fact that he had suffered a severe attack of dementia and physical prostration, necessitating the attendance of two physicians and his confinement in a sanatorium for the insane, under the care of a third physician, are immaterial facts which the appellant company had no right to know, and which, if known, would have been wholly immaterial to the risk? Again, can it be said as a matter of law that the false statements in the application that the insured was last prescribed for by Dr. J. B. Stanley, and by him only for insomnia and nervousness and that he had been consulted or prescribed for by any other physicians during the last ten years are immaterial statements?

In determining these questions must the general law, as construed and announced by the supreme court of this state control? or is the contract a Pennsylvania contract, and, if so, can the statute of Pennsylvania have any application under the facts of this case?

It was not denied by counsel for the plaintiff in the lower court that the statements contained in the application are warranties, to the absolute truth of which the insured must be held. Counsel have not questioned the law as declared in this state, in *Co-operative Association* v. *Leflore,* 53 Miss., 1, and in *Planters Insurance Company* v. *Myers,* 55 Miss., 479. These cases, which have never been modified or questioned, declare, as do the courts of practically all of the states, that a warranty in a con-

tract of insurance extends to every matter which it embraces, whether material to the risk or not, and the assured commits himself to the literal truth of the statements warranted. Nor was the rule announced in these cases questioned, that the language of the application itself, and the reference to it in the policy, made the statements contained in the application warranties. Being warranties, it is wholly immaterial whether they affect the risk or not; or whether the false warranties were made wilfully or innocently.

As these two cases leave no doubt as to what the law is in this state, the only way to escape their effect, open to the plaintiff, was and is, to contend that the contract is a Pennsylvania contract and within the protection of the statute of that state. The replication setting up this contention was filed after the depositions were taken, and seems to have been an afterthought, born of the necessity of the case.

To this contention we say that the contract is not a Pennsylvania contract, but if it is, the statute and decisions of that state will not aid the case for plaintiff. We must presume that this replication, setting up the Pennsylvania statute, was filed in ignorance of the recent statute of this state. Sec. 14 of Chapter 59, Act 1902 (Laws) 66, expressly provides that the situs of every contract of insurance upon, or concerning any property, or interest, or lives in his state, or with any resident thereof, shall be in this state and shall be deemed to be made therein. This act has been brought forward and is now part of the Code of 1906. In view of this plain provision, we fail to see how it can be argued that the Mississippi courts must ignore this statute and follow a Pennsylvania statute. It is true the application contained a formal provision that the policy and application shall be construed according to the laws of the state of Pennsylvania. This provision was doubtless inserted for the purpose of securing uniformity of construction, and nothing was wrong or reprehensible in thus endeavoring to make definite the rule of construction that is to apply to the contract. But, of course, the

stipulation can have no application as against the statute to the contrary. Our statute is intended to cover just such a case as this, and, in turn, to secure uniformity of construction of all policies of every company covering risks in this state. It is thought better that all such policies, by whatever company issued, should in the courts of this state be construed according to the laws of this state than that the company be left free to contract as to what law should govern. Whatever may be the reason, *ita lex est scripta.* It was suggested rather than argued in the court below that the appellant company, having inserted this provision in the policy, was estopped to invoke the statute of this state as the situs of the contract. This argument has at least the charm of novelty. Of course, our statute cannot be set aside, either by the contract of the parties or by the conduct of the parties. Neither party could be permitted either by contract or estoppel to evade a law of this state. The stipulation in the application is as much that of the applicant as that of the company. If the statute of this state fixing the situs and providing what law should govern cannot be invoked by the company, then it could not be invoked by the insured, and it would result in every case that the act of 1902 could be made nugatory by a stipulation in the policy that the law of another state should govern, and this stipulation would be binding on both parties; and, since only the insurer and the insured and their privies ever assert rights or defenses under policies it would result that the statute could never have any force at all as against such a stipulation.

But out of deference to the learning and standing of counsel for appellee, we will examine somewhat into the statute and decisions of Pennsylvania and show that, if they are to govern, they will not avail to save the plaintiff's case. The Pennsylvania statute of June 23, 1885, is as follows:

"Whenever the application for a policy of life insurance contains a clause of warranty of the truth of answers therein contained, no misrepresentation or untrue statement in such application made in good faith by the applicant shall affect the for-

feiture, or be the ground of defense of any suit brought upon the policy of insurance issued upon the faith of such application, unless such misrepresentation or untrue statement relate to some matter material to the risk."

The only effect of this statute is to change the general rule that waranties must be given full effect, whether the matters warranted are material or not to the risk, provided applicant made the false statement in good faith. *March* v. *Metropolitan Life Ins. Co.*, 186 Pa., 629; *U. B. Mutual Aid Society* v. *O'Hara*, 120 Pa., 256; *Mengal* v. *Insurance Co.*, 176 Pa., 280; *Murphy* v. *Prudential Life Ins. Co.*, 205 Pa., 244.

In *Rinker* v. *Aetna Life Ins. Co.*, 214 Pa., 608, notwithstanding the Act of 1885, the court held that a false answer in the application as to whether the insured had ever undergone any surgical operation was, as a matter of law material to the risk. There was no direct ruling to this effect, but it was assumed on both sides and by the court that such concealment, if, in fact made, was material. The controversy was, whether in fact, the applicant had made the disclosure or not.

It will be seen from the foregoing authorities that before plaintiff can escape the effect of the decisions of this state and from the general rule of law as announced everywhere it is necessary, first, that our act of 1902 as to the situs of the contract be ignored and the contract held to be controlled by the Pennsylvania statute. In the next place, it would be necessary for plaintiff to show that the misstatements were innocently made; and finally, it should be necessary to show, not as a matter of law, but as a matter of fact, that the attack of sickness and consequent dementia in Memphis were not material to the risk. Plaintiff's case fails in each of these propositions. We have already shown that the contract must be construed according to the laws of the state. On the question whether the misstatements were made in good faith there was a clear issue of fact made by the rejoinder in short to the replications. As the misstatements or false warranties were clearly set up by plea, and the replications set up the good faith of the applicant, the bur-

den was on the plaintiff to show good faith, even if the Pennsylvania statute should govern. There was no evidence on this controverted point, but the court, as a matter of law and in the absence of any evidence, held that defendant could not prove anything about the illness or attack set up in the plea. This was so obviously erroneous that it does not call for discussion.

Insanity has been frequently and almost universally held to be a disease. It is so held not only by the courts but by writers on medical jurisprudence. See Taylor's Medical Jurisprudence, Ed. 1873, 853; 1 Wharton & S. Medical Jurisprudence, Sec. 257.

"Insanity is a disease of the mind which assumes as many and various forms as there are shades of difference in the human character. *Conn. Mutual Life Ins. Co.* v. *Lathrop,* 111 U. S., 612. To the same effect see *Bradley* v. *State,* 31 Ind., 492; *Mutual Life Insurance Co.* v. *Perry,* 82 U. S., 589; 54 Me., 227; 6 Bush., 270; Ray Medical Jurisprudence, Sec. 54; Hammond's Treatise on Insanity, 265; *Blackstone* v. *Standard Life & Accident Co.,* 74 Mich., 592; *Halle* v. *Texas, etc., Ry. Co.,* 23 L. R. A. 774; *Hoppes* v. *People,* 31 Ill. 385; Joyce on Insurance, Sec. 1846."

Finally, it may possibly be argued that the statement by Mr. Miazza that he had suffered from insomnia and nervousness as the result of doing day and night work, and had insomnia, was a fair and complete statement or description of the Memphis illness. Surely this cannot be held. There are few men who do not at times have insomnia and nervousness from over-work. This would naturally be considered, as it was, a trivial and transitory matter; but it falls so far short of describing or even suggesting the true nature of the Memphis malady that the question is not worthy of discussion.

The only way for counsel or the court to get around the misstatement as to the last physician who attended the applicant and as to the three physicians who had attended and prescribed for him was to ignore it. The only name given by the appli-

cant was that of J. B. Stanley who was not a physician at all. Counsel will perhaps argue, as they did below, that it was a mere error of initials.

*McWillie & Thompson,* for appellee.

The policy sued on is a Pennsylvania contract. It was made in Pennsylvania and was to be performed in that state, and by the concluding words of the application on which it was issued, is, under an agreement of the parties, to be construed according to the laws of that state.

The Pennsylvania statute (Act June 23, 1885), provides that no misrepresentation or untrue statement shall effect a forfeiture if made in good faith, unless the same relate to some matter material to the risk.

This statute requiring that the misrepresentation shall be material to the risk has been several times construed, and it is held that the same means actual bad faith, the intent to mislead that must be found in convicting one of the crime of false pretenses. *Penn., etc., Ins. Co.* v. *Merchants, etc., Co.,* 73 Fed., 653; *Penn., etc., Co.* v. *Mechanics, etc., Co.,* 72 Ib. 413.

The Pennsylvania statute is construed to mean just what is plainly expressed in the statute of Missouri. *Keller* v. *Home Ins. Co.,* 95 S. W., 903.

The defendant contended by way of demurrer to the rejoinder of the plaintiff that notwithstanding the action of the parties had made the contract a Pennsylvania contract that it must be treated as a Mississippi contract because the last clause of Section 14 of the Mississippi Statute of 1902 establishing the Insurance Department (Laws 1902, p. 66) it was provided that "all contracts of insurance on property, lives or interests in this state shall be deemed to be made therein."

This provision, as a reading of the whole act will plainly show, was intended merely to compel foreign insurance companies to conform to the requirements of the act by treating contracts made by them on lives, property or interests in this state

as contracts made in this state, no matter where they were in fact made and was in aid of the provision making it unlawful for them to solicit such insurance in this state except as authorized by the act. In other words it contemplated that the insurance contracts of foreign companies that failed to make the requisite showing and procure a license to do business in this state whenever they covered lives, property or interests in this state should be treated as made here, and made here in such violation of law as to subject the company making them and its agents and others effecting insurance in it to the penalities of the act.

If the contract be treated as "made" in Mississippi, that in no wise affects the application of the laws of Pennsylvania in its construction, since it was to be performed in Pennsylvania, and that would be sufficient to make its construction depend upon the laws of that state without resort to the express stipulation of the parties that it should be construed according to those laws. The provision that the contract should be treated as "made in this state" answered the purposes of the act, and the legislature did not in the least intend to interfere with the liberty of private contract, and especially did not intend to defeat the application of laws more favorable to the Mississippi policy holder than our own laws, when the parties had expressly stipulated that the contract should be construed according to such more favorable laws.

Clearly our act of 1902 does not affect the application of the Pennsylvania statute, and with that statute to govern the construction of the contract it is idle to inquire what has been decided as to the avoidance of policies by immaterial misrepresentations in this state or elsewhere, or what has been said as to their avoidance by misrepresentations not made in bad faith in jurisdictions where proof of bad faith is not essential.

In entire harmony with this view was the action of the court below on the pleadings and in sustaining the motion of plaintiff to suppress the depositions of Memphis witnesses taken by de-

fendant.   These depositions show simply that the decedent had an acute attack of dementia in October, 1903, in Memphis where he was keeping a hotel, that he was prescribed for by Dr. R. S. Stanley, the father of Dr. J. B. Stanley both of whom boarded at decedent's hotel, that decedent insisted he was not crazy but was carried to Dr. Patty's sanitarium where in a short time he was completely cured, his condition having been due to the use of alcohol and overwork and mental worry, that his recovery only involved the elimination of toxic material from his system and that treatment for this with sedatives and rest soon relieved him; that he began to improve in about four days and in one week's time was fairly normal, that he stayed at the sanitarium about three weeks and his mind cleared up and the derangement disappeared entirely.

There was in these suppressed depositions absolutely nothing to show any material misrepresentation, nor any bad faith on the part of the decedent; and as the defendant offered no other evidence in support of its defense, it was entirely proper for the court to charge the jury to find for the plaintiff as well as to suppress the depositions.

It was claimed that the policy was forfeited because it is untrue that Dr. J. B. Stanley was the last physician the deceased consulted or who prescribed for him.

It cannot be said that a misrepresentation is material unless the contrary state of case to that represented would have rendered more probable the event on which the policy is to become payable, that is to say, the death of the insured in a case of life insurance.   A man's life or death may be said to depend in some measure on what physician he next employs, but after he had entirely recovered it is in no wise affected by what physician he last employed.

In North Carolina, which has a statute providing against forfeitures unless the misrepresentation is "material" and was frauduently made, the courts observe the plain distinction between the effect of that statute and the effect of those like the

Pennsylvania statute here involved which provide that the fraudulent misrepresentation must be "material to the risk." It was there held that a "material misrepresentation" might include one which deprived the insurer of knowledge of facts which it was entitled to know and which might affect its action on the application, but that a misrepresentation "material to the risk" only included such misrepresentations as related to defects contributing to the loss or damage for which the indemnity is claimed, as, in this case, to the death of the insured. *Fishblate* v. *Fidelity, etc., Co.,* 53 S. E., 357.

It is claimed in this case that the insured had several years before had a temporary attack of dementia, superinduced possibly by the alcoholic stimulants he took to relieve the effects of overwork and insomnia. He suffered from no permanent disorder and as soon as his system was cleared of the toxic matter his mind was fully restored. He was entirely well in a short time both mentally and physically and it is impossible to see how it could be material to the risk what physician had last prescribed for or been consulted by him, when none had done so since the attack of dementia.

Moreover, it will be observed that a Dr. Stanley also of Memphis and the father of the Dr. Stanley named in the application, was one of the physicians who sent him to the sanitarium in Memphis when he was suffering from dementia. It was clearly this physician that the deceased referred to and it cannot be material that he got his initials confounded with those of his son, both having been perhaps seen only on the hotel register. Whether he consulted this Dr. Stanley or not or received a prescription or not it seems that he retained at the time of the doctor's intervention in his behalf a sufficient mental perception to note the fact and that this connection with a Dr. Stanley is what he meant to refer to, whether it included strictly speaking a consultation or prescription or not. It seems that he never received any sort of medical attention from the other Dr. Stanley.

It will be noticed that the answer is as to the last physician he

consulted or who prescribed for him. It certainly cannot be said that he ever consulted Dr. Petty as he was sent to that gentleman's sanitarium while in a state of dementia and left as soon as his mind was restored. Dr. Petty may have been the last physician who prescribed for him, but the representation may relate to the last physician consulted by him, who as he supposed was a Dr. Stanley. Whether J. B. or R. S., Dr. Stanley was the last person giving him any medical attention or consideration before he went to the sanitarium, and we cannot think it is material that his initials are R. S. instead of J. B. If so it might also be material how he spelled the name Stanley as in the way above given, or as Stanly, or Stanlie or Stannly. At all events the name, occupation and residence of the party were given to enable the insurer to ascertain who was meant. The defendant readily ascertained, after the loss occurred, Dr. Stanley's connection with the case, and it would have been just as easy to do so before issuing the policy.

Apart from what has been above presented, we find that it is held that untrue and incorrect statements as to the last attending physician do not work a forfeiture. *Plumb* v. *Penn. Mutual, etc., Co.,* 108 Mich., 94, 65 N. W. 611; *Union Central, etc., Co.* v. *Pauley,* 8 Ind. App. 85, 35 N. E. 190; *Dilleber* v. *Home, etc., Co.,* 69 N. Y., 256, 25 Am. Rep., 182; *World etc., Co.* v. *Schultz,* 73 Ill. 586.

It is important to note that in the application besides saying in answer to one question that Dr. Stanley who attended him in October, 1903, was the last physician who was consulted by or prescribed for him, the insured also stated in answer to another question that he had not consulted or been prescribed for by any physician for the ten years next preceding the date of the application. The first answer could not have been true if the second was, and the second could not have been true if the first was, and both related to substantially the same subject for he was required by the second to give the name of the physician, and date and nature of illness for the last preceding ten years.

With this manifestly false statement on the face of the ap-

plication touching this subject the insurer proceeded to issue the policy as if the matter were immaterial and it ought now to be so regarded.

Clearly defendant relied on the report of its own medical examiner made at the time of the application. *Keller* v. *Home Ins. Co.,* 95 S. W., 909, 910.

Where it appears on the face of an application that a question is not answered at all, or is answered imperfectly, the issuance of the policy without further inquiry will constitute a waiver of the defect in the application and render immaterial the omission to give a perfect answer. 16 Am. & Eng. Ency. of Law (2d ed.), 937.

If an insurance company issues a policy and accepts a premium with knowledge that a ground of forfeiture exists at the time, it is estopped to set up a forfeiture in the absence of collusion between its agents and the insured. 16 Am. & Eng. Ency. of Law (2d ed.), 943; *Fishblate* v. *Fidelity, etc., Co.,* 53 S. E., 357.

In this case if it be material what physician was consulted by or prescribed for the deceased, the defendant is estopped to set up any forfeiture of the policy on account of any misrepresentation in regard to that matter. It knew when it issued the policy from the face of the application that there had been a misrepresenation.

The defendant also claimed that the deceased failed to disclose the attack of dementia in 1903 in answer to an inquiry that covered any "sickness, disease, ailment, injury or complaint" that he might at any time have suffered from.

The words here used are according to the best lexicographers' synonyms. They might all be omitted except the word "disease" without substantially affecting the meaning of the representation, and that word does not as used in insurance policies cover slight and temporary disorders which pass away leaving no trace in the constitution. See *Penn Mutual, etc., Co.* v. *Mechanics, etc., Co.,* 72 Fed., 432, and authorities cited.

If mere passing ailments were referred to there would be a

breach of the policy if the insured had ever been stung by a wasp or nauseated by a bad cigar, which would be absurd.     That the inquiry as to past indisposition did not cover slight or temporary affections is shown by the difference between the inquiry touching that and the inquiry as to the affections existing at the time of the application in respect to which maatter we find the same words, with the addition "trivial or otherwise."     In other words slight indisposition in the past if the insured was then in good health was immaterial, although slight indisposition at the time of the application, the result of which could not be foreseen, was material.

We insist, moreover, that the words "sickness, disease, ailment, injury or complaint" as used in the representation under consideration related solely to bodily and not mental disorders.

It will be observed that identically the same words with the addition of "trivial or otherwise" had been used in respect to the present condition of the insured at the time of the application.     They manifestly relate as first used to bodily disorders, for no one would ever ask a party with whom he was contracting as one of sound mind whether at that time he was mentally capable of contracting.     He assumes when he makes the contract that the other contracting party is mentally capable, for no answer that might be made would bind one who was *non compos mentis.*     Assuming, as we say, that the words as first used relate alone to bodily disorders we have a right to say that as again used they have the same signification.     On the maxim *noscitur a sociis,* they are to be taken as relating to things *ejusdem generis.*

When the language in a policy may be understood in more senses than one, it is to be taken in the sense in which the insurer had reason to suppose it was understood by the insured. *Dilleber* v. *Home, etc., Co.,* 69 N. Y., 356, 25 Am. Rep., 187; *Hoffman* v. *Ætna, etc., Co.,* 32 N. Y., 405.

There was every reason in this case to suppose that the insured, who has just answered an inquiry as to bodily disorders

employing the same terms, was still referring to bodily dis-
orders.

As no man could ever know of his own knowledge that he had
been "out of his head" while suffering from a bodily disorder,
it would be quite absurd to invite any statement from him on
the subject.   In respect to all mental troubles the representa-
tions of other persons are those to be sought.   The inmates of
our asylums are always unable to account for the perversity
of their relatives in having them confined and generally regard
their keepers as the real sufferers from loss of reason.   The
inutility of inquiring of one as to his own mental condition is
shown by the very application in question for while no inquiry
whatever was made as to applicant's mental status either past
or present, he was required to state whether any of his relatives
had ever been insane.

It is clear that the words in question were used by the parties
in relation to bodily disorders and this must be the interpreta-
tion of the contract even if against the ordinary meaning of the
words.   17 Am. & Eng. Enc. of Law (2d ed.), 11.   The
words in their common acceptation relate to bodily troubles.
When they are otherwise used the adjective "mental" almost
uniformly precedes them.   When we say that a man is sick, is
afflicted with disease, is disabled by an injury or is ailing, we
are universally understood to refer to his physical condition.
The words used in an insurance contract must be understood in
their plain, ordinary and popular sense unless it is clear that
the parties employed them in a different sense.   16 Am. &
Eng. Enc. of Law (2d ed.), 863; 17 Ib., 11.   When the terms
of a policy admit of two constructions that must be adopted most
favorable to the insured.   Especially is this the rule as to the
printed portions of the contract the form of which is prepared
by the company without consulting the insured.   16 Ib. 863,
864; 17 Ib., 16, 17.   If it be possible to avoid so doing the
courts will not adopt a construction of a contract which will
work a forfeiture under it, since forfeitures are not favored in

law.   17 Ib., 18.   We have no fault to find with the cases
cited by appellant's counsel.   The case of *U. S. Mutual, etc.
Co.* v. *O'Hara,* 120 Pa., 256, did not arise under the Pennsyl-
vania statute of June 23, 1885, although it was decided in 1888,
as stated by counsel.   The policy was issued in 1881 and the
suit brought in 1882.   In the other cases cited it will be found
that the false answers related to matters that were beyond all
doubt material to the risk, which, moreover, were of such a
nature that the supression of the truth was necessarily fraudu-
lent.

The spitting of blood, discussed in *March* v. *Ins. Co.,* 186
Pa., 629, is serious because indicative of tuberculosis, one of
the most fatal of all diseases, and one denying that he had ever
spit blood could not possibly have forgotten a recent violent
hemorrhage from the lungs.   So also a surgical operation, dis-
cussed in *Rinker* v. *Insurance Co.,* 214 Pa., 608, is rarely re-
sorted to except in serious cases and the suppression of the fact
by the insured that he had undergone one could only be attribu-
ted to bad faith.   Whether or not the applicant has always
been temperate is beyond question material to the risk, and it
was a false answer to this question that was discussed in *Mengal*
v. *Ins. Co.,* 176 Pa., 280.   In response to a question as to when
and for what he had last consulted a physician and who was the
physician, the applicant answered that Dr. Keiser about a year
before had treated him for slight influenza when in fact only
four months previous Dr. Keiser had prescribed for him for
vomiting and nausea *caused by drunkenness.*   The inquiry and
response as to the physician who last attended him, etc., became
important when it was ascertained that if the truth had not been
wilfully suppressed the company would have acquired knowl-
edge of his intemperate habits.   The contention was that he had
answered falsely, in stating that he had always been temperate
and did so wilfully, and not that he had not told who his last
physician was and for what he was treated.

In the case of *Murphy* v. *Ins. Co.,* 205 Pa., 444, also cited

by opposing counsel, it was held that a false statement might be so clearly material to the risk that the court could under the Pennsylvania statute charge the jury to find for the insurance company. Of course the converse of this proposition is true and if it is clear that the statement is not material to the risk the defendant cannot defeat recovery without proving that bad faith within the meaning of the Pennsylvania statute, which is interpreted by Judge Taft in 73 Fed., 653, 655, to refer not to constructive bad faith, nor gross carelessness but to "the same actual intent to mislead that must be found in convicting one of the crime of false pretenses.";

The same great judge in a review of the Pennsylvania decisions and authority elsewhere defined representations material to the risk as those which, if made known to the insurance company, would lead to the rejection of the risk. *Penn Mutual, etc., Co.* v. *Mechanics, etc., Co.,* 72 Fed., 430.

In this case there was no defense predicated of intemperance or any answer in respect thereto. Only two defenses were set up. One was that the decedent had answered untruthfully as to the name of the physician who last attended him in 1903, and the other was that he failed to show that he was then suffering from dementia. We can imagine no reason why counsel for appellant should have quoted in their brief the representation of decedent as to his use of intoxicating liquors, since no defense was founded upon it.

As to the first defense, we beg to observe, in addition to what has been already said on this subject, that it is not only entirely obvious that the decedent answered in perfect good faith, but as well that his answer imparted such information as made it readily ascertainable who the physician in question was. There were two Dr. Stanleys in Memphis when the depositions were taken, father and son, both of whom at the date in question lived at the decedent's hotel, but Dr. R. S. Stanley was the only one engaged in practice. The decedent not only gave the surname of the physician and his place of residence correctly, but

also gave the date of the treatment, and it is certainly immaterial that he confounded the son's initials with those of the father.   If this be so then it would also be material to the risk if he had undertaken to give the street number of his physician's residence and made a mistake in that.   Is it possible that the risk would have been rejected if the company had know that Dr. Stanley's initials were R. S. instead of J. B. ? It is not pretended that any inquiry was made of Dr. J. B. Stanley prior to the death of the decedent, and the fact that it was his father who attended the decedent was then immediately discovered as it might have been at any time previous.

Transient ailments that pass away leaving no trace in the constitution are not diseases within the meaning of a life insurance policy.   *Connecticut, etc., Co.* v. *Union, etc., Co.,* 112 U. S., 250; *Insurance Co.* v. *Moore,* 6 App. Cas., 648; *Indemnity Co.* v. *Dorgan,* 116 U. S. App., 290, 58 Fed., 945; *Insurance Co.* v. *Wise,* 34 Md., 582; *Wilkinson* v. *Insurance Co.,* 30 Iowa, 119; *Fitch* v. *Insurance Co.,* 59 N. Y., 557; *Cushman* v. *Insurance Co.,* 70 N. Y., 72, 77; *Goucher* v. *Association,* 20 Fed., 596; *Society* v. *Winthrop,* 85 Ill., 537; *Insurance Co.* v. *McTague,* 49 N. J. Law, 587, 9 Atl., 766; *Brown* v. *Insurance Co.,* 65 Mich., 305; *Haun* v. *National Union,* 97 Mich. 513.

Argued orally by *C. H. Alexander* and *James A. Alexander,* for appellant, and by *T. A. McWillie,* for appellee.

MAYES, J., delivered the opinion of the court.

On the 12th day of January, 1906, Peter S. Miazza applied to the Fidelity Mutual Life Insurance Company for a policy of insurance on his life in the sum of $1,000.   As a condition preceding the acceptance of any risk, the insurance company has a form of application which it is required that all persons desiring insurance shall sign, and in this application there are contained many questions addressed to the applicant for insurance; the object being to obtain general information as to the physical condition of the person seeking insurance, so as to en-

able the insurance company to determine whether or not it will
assume the risk. The application is in form of a certificate and
is prefaced as follows, viz.: "I hereby apply to the Fidelity
Mutual Life Insurance Company, of Philadelphia, Pa., for a
policy of insurance, to be issued in pursuance of this applica-
tion, and certify as follows." Succeeding this preface follow
the matters certified to, which are: (1) The name of appli-
cant and date of birth; (2) that the applicant is in good health
and free from any and all diseases, etc.; (3) the occupation of
applicant. It is not contended that any incorrect answers were
made as to the foregoing matters, but the contention arises over
the answers to the fourth, fifth, sixth, and tenth clauses of the
application, and we here set them out in full, together with the
answers: "(4) That I have never had or been afflicted with
any sickness, disease, ailment, injury, or complaint, except as
here stated. (Give full particulars as to the nature thereof,
date and duration, whether trivial or otherwise. If rheuma-
tism, state whether muscular, sciatic, or inflammatory.) Ans.
I had yellow fever in 1878. Oct., 1903, was overworked.
Was doing both night and day work, and had insomnia and
nervousness for about two weeks. Full recovery. No symp-
toms since. (5) The last physician I consulted or who pre-
scribed for me was Dr. J. B. Stanley, of Memphis, about Oct.,
1903, for the sickness here stated, insomnia and nervousness.
(6) That I have not consulted or been prescribed for by any
physician or medical man during the past ten years. * * *
(10) That I do not use, and have never used, narcotics, and
have never used daily exceeding two ounces of spirits, or two
drinks of wines or malt liquors, and have always been temper-
ate and sober, except as stated below. Never drank habitually,
nor to any excess." At the conclusion of the application, and
preceding the signature of the applicant, is to be found the fol-
lowing agreement: "I hereby agree and bind myself as fol-
lows: That the truthfulness of each statement above made or
contained, by whomsoever written, is material to the risk, and
is the sole basis of the contract with the said company; that I

hereby warrant each and every statement herein made or contained to be full, complete, and true," etc.   The application is attached to and made a part of the policy, and by the policy of insurance it is made one of the general precedent conditions that "the application, copy of which is given on third page, forms the sole basis of this contract," etc.   After making the application, the medical examiner, acting for the insurance company, made an examination of Mr. Miazza, passing him, and the company duly issued its policy to him for the sum of $1,000, taking effect on the 19th day of January, 1906, and being payable to his wife, Emma S. Miazza.   On the 9th day of March, 1906, a little less than two months from the issuance of the policy, Peter S. Miazza died in the insane hospital in Jackson, Miss., having been placed there by his relatives because of a deranged mind.   After the death of Mr. Miazza demand was made on the insurance company for payment of the policy.   Payment was refused, whereupon this suit was brought.

In deciding this case we do not deem it necessary to follow the course of the pleadings, deeming it sufficient to say that the demurrer filed by plaintiff to the rejoinder of defendant should have been overruled, and the demurrer filed by defendant to the replication of plaintiff, whereby it was sought to have this insurance contract construed as a Pennsylvania contract, should have been sustained, and not overruled.   By section 14, c. 59, p. 66, of the Laws of 1902, in force at the time of the execution of this contract, it is provided that "all contracts of insurance on property, lives or interests in this state shall be deemed to be made therein."   This is the law of this state, and no contract of the parties can change it.   It follows that this contract is to be construed under the law of this state.   *Grevenig* v. *Washington Life Ins. Co.,* 104 Am. St. Rep., notes from 488 to 492 ; *Horton* v. *Home Ins. Co.,* 122 N. C., 498, 29 S. E., 944, 65 Am. St. Rep., 717.

The defense offered to be made by the insurance company was that there was a misrepresentation made in the application, material to the risk, and constituting a condition precedent to

the making of a valid contract of insurance; that in the application for insurance Peter S. Miazza stated that he had never been afflicted with any sickness, disease, ailment, injury, or complaint, except that he had yellow fever in 1878, and in October, 1903, was overworked doing both day and night work, and had insomnia and nervousness for about two weeks, and that there had been a full recovery, and no symptoms thereof since, when, as a matter of fact, about October, 1903, the applicant was affected with dementia, which caused his confinement for about two weeks, and was of such character that it would, if it had been disclosed to the insurance company, have prevented him from obtaining insurance. It was farther alleged in the plea that Peter S. Miazza stated in the application that the last physician who prescribed for him was Dr. J. B. Stanley of Memphis about October, 1903, for the sickness indicated in the fourth answer—that is, for insomnia and nervousness—and that he had not consulted or been prescribed for by any other physician or medical man for the past ten years, when in truth the last physician consulted or prescribing for the applicant was not Dr. J. B. Stanley, and it was not true that such consultation and prescription was merely for insomnia or nervousness. The pleas of defendant further set up the fact that about the 12th of October, 1903, the applicant consulted and was prescribed for by Drs. Stanley, Turner, and Patty of Memphis, which fact was not known to the defendant, and if it had been, the policy of insurance would not have been issued.

In support of the issue thus made by the plea the defendant took the depositions of Drs. Stanley, Turner, and Patty. The testimony of Dr. Patty is that Miazza was brought to his sanatorium on the 12th day of October, 1903. The purpose for which he was brought was for treatment for acute dementia, coupled with alcoholism, and he remained at the sanatorium for about three weeks. When he was brought to the hospital he was insane to such an extent that he thought it was unsafe to allow him to be at liberty. He was very nervous and much emaciated; his system being in a very toxic condition. He says

he considered the condition of Mr. Miazza to be partly due to alcoholism and partly to overtaxation and mental worry; that the condition in which he found him might result fatally, and seriously impaired his chances of general good health and longevity. Whether there could have been a permanent cure or not, he thought, depended upon the manner of treatment and the circumstances under which Miazza was placed. Dr. Stanley testified that he also attended the case, when Miazza was carried to the sanatorium, in conjunction with Dr. Patty. He stated that a week's time after reaching the sanatorium Miazza's mind was improved and he was in a fairly normal condition. Dr. Stanley also testifies that Miazza was suffering with acute mania, and had an idea that detectives were after him, and was irritable and in a very nervous condition. Dr. Turner testified that he was called in consultation with Dr. Stanley about October 11, 1903; that he made a physical examination of Miazza at the Clarendon Hotel, and found him totally deranged; his physical condition was that of total dementia, and he showed the effects of insomnia and deficient nourishment. Turner advised the incarceration of Mr. Miazza in some safe place, where he could be prevented from harming himself and others; that it had been his experience in some cases of persons affected in a manner similar to Mr. Miazza that they recovered entirely, and again it resulted fatally. This testimony was offered by the appellants in the court below, and on a motion to suppress the depositions the court sustained the motion and gave peremptory instructions for the plaintiff. This was error. The question should have gone to the jury to determine whether or not there had been any misrepresentation by Miazza in his application for insurance of a matter material to the risk, and this testimony was relevant and competent on that point.

By the terms of the contract it is expressly agreed "that the truthfulness of each statement above made or contained, by whomsoever written, is material to the risk, and is the sole basis of the contract with said company," etc.; and the contract further provides that, "if any concealment or untrue statement

or answer be made or contained herein, then the said policy and this contract shall be *ipso facto* null and void," etc.   We are not prepared to hold that a stipulation in the contract of insurance of the character above quoted will have the effect of making every statement made or contained in an application of insurance material to the risk, thus avoiding the contract, whether such statement be in fact material.   This would seem to have been held in the case of *Co-operative Life Association* v. *Leflore,* 53 Miss., 1; but an examination of the facts shows that in that case the facts misstated were material.   Courts are not given to avoiding contracts for misrepresentations of an immaterial nature, and to adopt this rule in its application to contracts of insurance merely because it is stated in the contract that any misstatement should be deemed material, can subserve no purpose of right.

At this time the matter of insurance has become so important a factor in human affairs that it cannot now be said that such contracts are matters of purely private concern.   The public are vitally interested in the kind and character of contract which an insurance company may lawfully make, to such an extent that it may be said that such contracts are of a quasi public character, and to a greater or less extent affected with a public interest.   In nearly every state in the union this is recognized to such an extent that the state governments have created a special insurance department; the sole and important duty of the department being to supervise insurance and insurance contracts.   In states where the courts have held what would seem to be held by the case of *Co-operative Association* v. *Leflore,* 53 Miss., 1, the legislatures of the states have repudiated the holding by enacting laws prohibiting insurance companies from relying on the misstatements made in an application as a defense, unless these misstatements relate to some matter material to the risk.   If the misstatement is material, it can make no difference as to whether or not it was made in good faith.   In the case of *Co-operative Association* v. *Leflore,* 53 Miss., 18, the court says:   "The application and the policy, constituting

but parts of an entire contract, are to be read as one instrument, and such construction is to be adopted as renders them harmonious. This is accomplished by giving the word 'fraud' its legal meaning, by which will be embraced misstatements by which the company has been deceived, though not fraudulently intended by the applicant. To limit it to designed and intentional bad faith is to do violence both to the letter and spirit of the other portions of the instrument." In this case it can hardly be doubted that, if there had been a full disclosure on the part of Miazza as to the character of his illness in 1903, it might reasonably have influenced the company not to make the contract of insurance.

The principle here applied to this contract is but a principle of general application. It is the universal rule that any contract induced by misrepresentation or concealment of material facts may be avoided by the party injuriously affected thereby. If the applicant for insurance undertakes to make a positive statement of a fact, if it be material to the risk, such fact must be true. It is not sufficient that he believes it true, but it must be so in fact, or the policy will be avoided, provided, always, that the misstatement be about a material matter. If the applicant is not informed as to any question asked in the application, he should so state, and there can then be no misrepresentation.

For reasons indicated in this opinion, the judgment is *reversed and cause remanded.*