MASSACHUSETTS MUTUAL LIFE INSURANCE COMPANY, Plaintiff,

v.

Sue B. NICHOLSON, Defendant.

Civ. A. No. EC 90–164–D–D.

United States District Court, N.D. Mississippi, E.D.

Sept. 23, 1991.

---

Kenna L. Mansfield, Jr., Jackson, Miss., for plaintiff.

Thomas L. Kesler, Hal H.H. McClanahan, III, Columbus, Miss., for defendant.

## MEMORANDUM OPINION

DAVIDSON, District Judge.

This action was before the undersigned United States District Judge, sitting without a jury on August 22 and 23, 1991 in Aberdeen, Mississippi. After considering the oral and documentary proof received at trial, together with the parties' proposed findings of fact and conclusions of law, the court makes the following findings of fact and conclusions of law as required by Rule 52(a) of the Federal Rules of Civil Procedure.

## FINDINGS OF FACT

The plaintiff, Massachusetts Mutual Life Insurance Company (Mass Mutual), filed a complaint for declaratory judgment requesting that this court declare the life insurance policy issued to defendant's decedent, Raymond Nicholson, null and void due to material misrepresentations during the application process. Sue B. Nicholson,

the defendant, is the sole beneficiary under the $100,000 policy.

Facts produced before and during trial show that the decedent died on March 7, 1990 after a long series of illnesses and hospitalizations dating back to February of the previous year. These hospitalizations and illnesses included: 1) treatment for back surgery in Baptist Memorial Hospital in Memphis, Tennessee, in February and March of 1989 by Dr. Doyle Sumrall; 2) diagnosis and treatment by two ear, nose and throat physicians, Dr. Joseph Bogess and Dr. Walter Cosby, for a knot which appeared on the right side of his face shortly after his back surgery [1]; 3) further diagnosis and a needle biopsy of the knot by Dr. Edwin Cocke, an oncologist, who initially suspected cancer but instead found the knot to be an infection in the parotid; 4) treatment with antibiotics by Dr. Mack Land, an infectious disease specialist; 5) hospitalization under the care of Dr. Land from May 25, 1989 until June 9, 1989 in Baptist Memorial Hospital in Memphis; 6) hospitalization under the care of Dr. Sumrall in the Golden Triangle Regional Medical Center in Columbus, Mississippi, from September 27, 1989 until October 6, 1989 after the decedent had suffered a series of weak spells and weakness in his arm; and 7) continued hospitalization and treatment under the care of Dr. Land from October 6, 1989 until October 12, 1989, during which time he was also seen by Dr. James Holbert for his low white blood count. Numerous tests and evaluations never fully revealed the source of the patient's problems. However, at various times, physicians suspected or diagnosed the following: granulomatous lymphadenitis, parotitis, leukopenia, anemia, autoimmune neutropenia and hepatomegaly. A more detailed account of Nicholson's hospital stays and treatments was recounted in an earlier opinion of the court and need not be reiterated here.[2] The focus of the dispute centers not on the number and type of hospital visits but on whether the substance of these visits should have been more fully disclosed during the application process.

On October 26, 1989, two weeks after his discharge from Baptist Memorial, Nicholson applied for the policy of life insurance that is now in dispute. John Clark, a soliciting agent for Mass Mutual, testified that he first approached Mr. Nicholson on a "cold call" in mid-October, which meant that he had no leads and no reason to believe that the Nicholsons would be interested in life insurance. Nicholson and Mrs. Nicholson, the defendant, explained that they already had a policy of life insurance, but indicated they would consider Clark's proposal. Clark stated that Nicholson appeared interested in additional insurance, but hesitated to change from his current policy. Clark recommended that Nicholson not change policies, but that he nevertheless consider the Mass Mutual proposal. Clark inquired again as to whether Nicholson was interested in a Mass Mutual policy after meeting him in town one day; the two met again to fill out the application at Nicholson's place of business, R & S Mobile Homes in Columbus on October 26, 1989.

Clark testified that in keeping with standard procedure, he read a list of "health questions" contained in Part II of the policy while Nicholson verbally responded. Although Clark recorded the answers to the questions, Nicholson was asked to read over the form and sign it at the end of the session. The health questionnaire, contained on a single page of a several-page application, consists of fourteen questions, some with several subquestions. The first and second questions request the age of the applicant and the name and address of the applicant's physician, while the remainder of the questions focus on the applicant's general health. These questions are presented in block form with spaces for "yes" and "no" responses. Questions 4A through 4K of Part II ask whether the applicant had "ever been advised of, treat-

1. The knot was diagnosed as an infected salivary gland.

2. That opinion focused on cross-motions for summary judgment then before the court.

These motions were denied. Because that opinion fully details the undisputed facts in the case, the court only generally focuses on those facts here.

ed for, or had any known indication of" a number of specified illnesses or diseases. According to Clark, the only affirmative response Mr. Nicholson gave was to Question 4H, which asks about disorders of the spine, back and related areas. Additionally, Question 7 of the health questionnaire states:

[W]ithin the past five years, have you:

A) Had any mental or physical disorder?

B) Had a check up, consultation, illness, injury, surgery?

C) Been a patient in a hospital, clinic, sanatorium or other medical facility?

D) Had an electrocardiogram, x-ray or other diagnostic tests?

E) Been advised to have any diagnostic test, hospitalization or surgery which was not completed?

Only Questions B, C and D are answered in the affirmative, when all five probably should have been answered affirmatively given Nicholson's history. Question 7E, for example, appears to be incorrectly answered because Dr. Land in October 1989 recommended that Nicholson undergo a liver biopsy, which Nicholson declined to do.[3] In a section at the end of the question list where the applicant is asked to give particulars to affirmative responses, detail is given as to the check-ups, consultations and hospital visits relating to Nicholson's back problems and a pinched nerve, while no detail is provided as to the other illnesses and related hospital stays. Whether the lack of information was due to Nicholson's concealment or Clark's failure to correctly record Nicholson's responses is the focus of this dispute.

The only people present during the session were the decedent, Mrs. Nicholson and Clark.[4] Mrs. Nicholson testified that she was answering telephones and tending to business while the application was being completed, so that she heard only parts of the discussion between Clark and her husband. Nevertheless, she remembered the two generally discussing her husband's health, his limp, his low white blood count and his back surgery, in which Dr. Leventhal assisted. Because neither Dr. Leventhal's name nor information about the limp and low white blood count were reflected in Part II of the application, she contends that Clark also could have omitted other, more material items from the application. She explained that Clark "was doing all the writing" and that she cannot be certain "if he accurately recorded what [her husband] told him on the form." It is her belief that her husband was forthright about all of his hospital visits and treatments. She reiterated what she had earlier stated in her deposition—that her husband had a series of medical problems that no one could definitely diagnose. She stated that her husband told Clark that he did not feel well and did not know what was wrong with him.

Clark, on the other hand, testified that aside from revealing minor pains, Nicholson did not reveal the extent of his problems. Clark testified that Nicholson did not disclose treatment by five of the six doctors he saw in the months preceding the application—doctors Boggess, Cosby, Cocke, Land and Holbert—and instead listed only the name and address of Dr. Sumrall and one other physician whom he allegedly saw for a "pinched nerve."[5] Clark admitted that there were portions of the application he now wishes he had handled differently; for example, if a question referred to multiple ailments, he tried to underline the particular ailment revealed, but

3. This fact is revealed in Dr. Land's discharge summary dated October 12, 1989. In this summary, Land stated that Nicholson said he would consider this treatment in the future if he did not improve.

4. At trial, defendant offered the testimony of a secretary, Theresa Mason, who also claimed to have been present during part of the session and claimed to have overheard some of the discussion between Nicholson and Clark. However, at trial, the court ruled that her testimony would only be admitted for impeachment purposes and that her testimony concerning the ultimate issues in the case would not be admitted due to the fact that the witness was not listed in the pretrial order.

5. This was Dr. Craig Clark of Memphis, whose name is listed in Part II of the application in the box in which the applicant was asked to detail any affirmative responses to earlier questions.

did not do so in question 7D, which inquired whether the applicant had undergone x-rays or other diagnostic tests in the past five years. Clark remembered that Nicholson spoke of having some x-rays, which was why the corresponding box was marked "yes." Although counsel for the defendant tried to suggest that Nicholson did reveal tests that might have been material to the other ailments, defendant was never able to produce any evidence on this point. As best as the court can determine, Clark at one point stated in his deposition that Nicholson mentioned having "some tests run," but later in both his deposition [6] and at trial testified that this was a phrase he himself used and that Nicholson had spoken only of having some x-rays performed relating to his back problems. He several times stated that the decedent did not reveal the knot on the side of his face, health problems other than his back, and the names of the other physicians not recorded on the application. Mass Mutual put forth the testimony of an underwriter and a claims representative to try to show that had this history been revealed, it would not have issued the life insurance policy.

In connection with her claim for benefits under the policy, the defendant completed a "Proof of Death" form [7] which requested a listing of all physicians who attended the deceased during the fatal illness and the five years preceding it. In that form, Mrs. Nicholson focused almost entirely on the back pain and back surgery by doctors Sumrall, Clark and Levanthal. The only other physician listed on the form was Dr. Land, who was treating Nicholson at the time of his death. Another section of the same Proof of Death form requires a listing of all hospitals in which the decedent was treated in the five years prior to the fatal illness. Again, the hospital visits apparently related to the back problems were listed, but not the several hospital stays in the spring related to the diagnosis of the

infected salivary gland. When questioned further as to this discrepancy, Mrs. Nicholson acknowledged that the Proof of Death form was incorrect. Similarly, Mass Mutual introduced into evidence a "Confirmation of Interview" form [8] which allegedly reveals the substance of an interview between the defendant and an interviewer by the name of Roy Thompson.[9] Lines 7 through 12 of that form, signed by Mrs. Nicholson, state:

> In Feb. of 1989, [the decedent] went to Semmes–Murphy Clinic at the referral of Dr. Sumrall due to a pinched nerve in his back. He had surgery to correct this at Baptist Memorial Hospital, Memphis, Tn. He recovered completely and was dismissed from this care. He had no other problems until Nov. 1989 when he began to feel sick and run down and saw Dr. Sumrall.

When asked by plaintiff's counsel about the decedent's significant health problems occurring in the spring of 1989, Mrs. Nicholson again agreed that the dates on the above form were not correct and testified that she could not remember whether she had told Thompson any of her husband's other problems. She did say that Thompson "didn't ask about any additional doctors." She noted that the Proof of Death and Confirmation of Interview forms were taken within a month of her husband's death and that if mistakes were made, she was too distraught at the time to notice them.

Based on all of the above and the absence of any information related to the facial knot, the biopsy and the several doctors treating the decedent in the spring of 1989 in these two forms as well as in the application, the court finds that Mrs. Nicholson's testimony is less credible than that of Clark. Like the plaintiff, the court finds it curious that three forms, signed by either the defendant or the decedent, fo-

---

6. Deposition of John H. Clark, pp. 65–66.

7. Exhibit P–4.

8. Exhibit P–5.

9. According to the plaintiff, Thompson is not employed by Mass Mutual but works for an independent company known as Equifax which tries to obtain complete medical histories of an insured when required.

cused on the back surgery rather than on the facial knot, weak spells, leg pains and general bouts of illness that occurred up to the time of the application session. At the summary judgment stage,[10] this court hesitated to grant summary judgment in favor of Mass Mutual because of the possibility that Mrs. Nicholson's statements as to what she thought she heard in the application session on October 26, 1989 would prove more credible at trial than Clark's account of that same session. However, Mrs. Nicholson was unable to refute any of Clark's testimony at trial. At best, her arguments were based on circumstantial evidence; if Clark failed to record her husband's limp and Dr. Levanthal's name, then he must have failed to record other important information as well. And although she apparently did not hear her husband speak of the knot on the right side of his face[11], did not hear him explain the ultimate diagnosis of an infected gland or name the doctors who treated it, she appears to contend that these revelations *could* have occurred based on what her husband *did* reveal.

The court does not find these speculations to be extremely weighty, especially given Clark's consistent testimony that he recorded Nicholson's answers correctly. Nor does the court find, as plaintiff insists, that the testimony of Ms. Mason impeaches[12] Clark's testimony. Ms. Mason also testified that she heard the name Levanthal mentioned during the application session. But Ms. Mason's testimony often was confused and inconsistent. She also appears to have had a very close family relationship with the deceased and the defendant. In summary, the court finds that Clark's explanations were entirely credible and that he faithfully recorded Nicholson's responses. The testimony of Mrs. Nichol-

son and Ms. Mason appears much less credible.

## CONCLUSIONS OF LAW

### 1. Did a Material Misrepresentation Occur?

In Mississippi, a material misrepresentation in an application for an insurance policy allows the insurer to void or rescind the policy. *Home Life Ins. Co. v. Madere*, 101 F.2d 292 (5th Cir.1939); *Deposit Guaranty Nat'l Bank v. Minnesota Mutual Life Ins. Co.*, 369 F.Supp. 8 (S.D.Miss.1973); *Coffey v. Standard Life Ins. Co.*, 238 Miss. 695, 120 So.2d 143, 148–49 (1960). The right to void or rescind occurs only where the answers given in the application are both false and material to the acceptance of the risk or the hazard to be assumed. Miss.Code Ann. 83–9–11(3) (1972). "If the misstatement is material, it can make no difference as to whether or not it was made in good faith." *Fidelity Mutual Life Ins. Co. v. Miazza*, 93 Miss. 18, 46 So. 817, 819 (1908). A misrepresentation is material if knowledge of the true facts would have influenced a prudent insurer in determining whether to accept the risk. 45 C.J.S. 595(3), pp. 406–07. Finally, an insurance company "has the right to rely on the information supplied in the application in determining whether or not to accept the risk." *Mattox v. Western Fidelity Ins. Co.*, 694 F.Supp. 210, 216 (N.D.Miss.1988) (referring to *Apperson v. United States Fidelity and Guaranty Co.*, 318 F.2d 438, 441 (5th Cir.1963)).[13]

Because the insurance company bears the burden of showing a right to rescind by clear and convincing evidence, *see, e.g., Gardner v. Wilkinson*, 643 F.2d 1135, 1136 n. 3 (5th Cir.1981); *Pedersen v.*

---

**10.** *See supra* note 2.

**11.** At one point in her testimony, she indicated that her husband did speak of the knot, but her testimony was extremely uncertain and the court does not find it to be credible.

**12.** *See supra* note 4.

**13.** As noted in the court's earlier opinion denying the cross-motions for summary judgment,

the right to rely on facts in the application is not necessarily absolute. If facts in the application would cause a prudent insurer "to start an inquiry which, if carried out with reasonable thoroughness, would reveal the truth," the insurance company "cannot blind [itself] to the true facts and choose to 'rely' on the misrepresentation." *New York Life Ins. Co. v. Strudel*, 243 F.2d 90, 93 (5th Cir.1957).

*Chrysler Life Ins. Co.,* 677 F.Supp. 472 (N.D.Miss.1988), the court must initially determine whether Mass Mutual has shown by clear and convincing evidence that the excluded information was material to the risk. The court discerns several questions in Part II of the application where an affirmative response would have caused a prudent insurer to act differently. For example, Question 4J asks whether the applicant has "ever been advised of, treated for, or had any known indication of ... [c]ancer, tumor, cyst or disorder of the skin or lymph glands." That question is answered "no." Consequently, no detail is provided as to the biopsy performed by Dr. Cocke, an oncologist, who initially suspected cancer but instead found the knot to be an infection in the parotid. Similarly, the application does not recount Dr. Land's treatment of the patient with antibiotics in an effort to end the infection. Because the question asks for "treatment" or "known indication" of cancer, the fact that cancer was not ultimately diagnosed did not remove Nicholson's obligation to respond affirmatively to the question.

Similarly, Question 7A asks if the applicant had any "physical disorder" within the past five years. The "no" box is checked even though the facial knot, the subsequent biopsy and the ultimate determination of the knot as a parotid infection would seem to indicate a "physical disorder." Had this question been answered affirmatively, and had the applicant produced details to this affirmative response as is required at the end of the list of questions, Mass Mutual, as a prudent insurer, would have had notice that Nicholson did have a serious health problem, even if no one yet could definitively diagnose it. Other subquestions within Question 7 did produce affirmative responses, such as 7B, which asks whether the patient had a checkup, consultation, injury or surgery within the past five years. Although the corresponding box to that question is marked "yes," the only detail provided is a

reference to Dr. Clark related to the back surgery.

For these reasons, the court concludes that material information was excluded from the application. Defendant argues that Mass Mutual could have discovered the names of all of the physicians simply because Nicholson gave the name of his regular treating physician, Dr. Sumrall, and signed a broad medical release that could have led an underwriter to the names of the other doctors. This is not the law in Mississippi. As noted, the insurance company has the right to rely on the information contained in the application, *Mattox,* 694 F.Supp. at 210, as long as the insurance company did not have "sufficient indications that would have put a prudent man on notice." *Strudel,* 243 F.2d at 93.[14] If facts in the application would cause a prudent insurer "to start an inquiry, which, if carried out with reasonable thoroughness, would reveal the truth," the insurance company "cannot blind [itself] to the true facts and choose to 'rely' on the misrepresentation." *Id.* Counsel for the defendant focuses on the latter portion of this rule, but *Strudel* suggests that something in the application must have put the insurer on notice in the first place.

### 2. Was the Application Form Deficient?

■■■ Although an insurance company has the right to rely on responses given in an application, Judge Senter, writing for the court in *Mattox,* has noted that "[i]f the company intends to rely exclusively on the application, it should ask questions tailored to elicit all of the information that it needs." *Mattox,* 694 F.Supp. at 216–17. Although acknowledging that the Mass Mutual form is far from perfect, the court is not persuaded by defendant's arguments that the long list of medical illnesses in the form failed to address Nicholson's problems. For example, Question 4G asks whether the application has ever been advised of treated for or had any known indication of an endocrine disorder. When questioned as to what category a problem

---

**14.** As noted by the court in its earlier memorandum opinion, *Strudel* refers to "general rules" of insurance law and Florida law in particular.

However, these general rules involving misrepresentation on an application for insurance appear to be the rules followed in Mississippi.

with the parotid gland would fall, Clark agreed that the parotid gland was part of the exocrine rather than the endocrine system. If this indeed is a failure in the form, numerous other sections of the form within Question 4 and elsewhere offered Nicholson ample opportunity to disclose his problems. Nor is the court persuaded that the list of diseases on the form was too complicated or that the agent insufficiently explained the form to the applicant. The defendant cannot benefit from her husband's lack of knowledge about the extent of his illnesses or his lack of knowledge as to whether certain of the categories would have applied to him. In Mississippi, even innocent misrepresentations provide grounds for an insurer to void a policy. *See Dukes v. South Carolina Ins. Co.*, 590 F.Supp. 1166, 1169 (S.D.Miss.1984) (no intent to misrepresent is required), *aff'd*, 770 F.2d 545 (5th Cir.1985). For these reasons, the court holds that the application form was not so insufficient as to remove the insurance company's right to rely on it.

### 3. Did the Actions of the Agent Remove the Insurance Company's Right to Rescind?

■■■■ Balancing those cases giving an insurance company the right to rescind due to material misrepresentation by the applicant is an equally authoritative line of cases that removes the right to rescind where an insurance agent "takes charge of the preparation of the application" and records the information inaccurately. *See, e.g., National Life & Accident Ins. Co. v. Miller*, 484 So.2d 329, 334 (Miss.1985); *World Ins. Co. v. Bethea*, 230 Miss. 765, 93 So.2d 624 (Miss.1957); *Planters Ins. Co. v. Myers*, 55 Miss. 479 (1877). These cases hold that if the agent suggests or advises what is to be answered, the company cannot void the policy because the answers were untrue "if full disclosures were made by the applicant to him." *Miller*, 484 So.2d at 334. Thus, the rule depends upon the insured "act[ing] in good faith throughout,

and that the false answers were inserted without his knowledge or consent." *Guy v. Commonwealth Ins. Co.*, 698 F.Supp. 1305 (N.D.Miss.1988) (citations omitted), *aff'd in part, and reversed in part on other grounds*, 894 F.2d 1407 (5th Cir. 1990).

In this case, the court has already determined that Clark faithfully recorded the answers given to him by Nicholson. Although he did "take charge of the preparation of the application," *see Miller*, 484 So.2d at 334, no evidence exists to suggest that he recorded the information inaccurately aside from defendant's statement, and perhaps that of Ms. Mason, that the name "Levanthal" was mentioned and not recorded, and defendant's statement that her husband may have mentioned his limp and low blood count. Again, the court doubts that such statements were made because of Mrs. Nicholson's own uncertainty as to what was said and the fact that she was in and out of the office and answering telephones while the application session was taking place. Clark probably should have responded affirmatively to a question in Part II of the policy regarding the applicant's lameness, not because the lameness was discussed—the evidence is too unclear on this point, but because he admitted that it was visible to him.[15] As to the reference to Dr. Levanthal, the court disbelieves defendant's testimony that the name was mentioned. Even if the name were mentioned, Dr. Levanthal was just one more of the physicians who treated the decedent for his back; given the several doctors treating Nicholson, the possibility that he offered Dr. Levanthal's name does little to suggest that he disclosed the names of those doctors related to his more serious illnesses. Nor does the court find that Clark steered Nicholson away from difficult questions or advised him as to how any of the questions should be answered. Defendant's counsel suggests that Clark had a reason to record incorrectly due to his "significant pecuniary interest in the

---

**15.** Clark testified that he noticed that Nicholson walked with a limp, but that it appeared not to hamper him in the performance of his work at R & S Mobile Homes. The court finds that the fact of the limp alone, if revealed on the application, would not have been sufficient to cause a prudent insurer to undertake a more detailed inquiry.

policy premiums that would be collected if the policy were issued,"[16] but absolutely no evidence exists, even from Mrs. Nicholson, that Clark misguided the applicant. For all of the above reasons, the court finds that the line of cases removing the insurer's right to rescind where the agent records information inaccurately or misguides the applicant does not apply here.

## CONCLUSION

For the above reasons, the plaintiff, Mass Mutual, is entitled to a judgment rescinding the subject policy and declaring the policy null and void. Mass Mutual is ordered to immediately tender all premiums and interest paid on the subject policy to the defendant. Because judgment will be entered in favor of the plaintiff, defendant's claim for punitive damages is denied.

---

**16.** Defendant's Post Trial Proposed Findings of Fact and Conclusions of Law, p. 7.