FIDELITY MUTUAL LIFE INSURANCE COMPANY v. EMMA S.
MIAZZA.*

SECOND [48 South. 1017.] APPEAL.

**1.** APPEAL AND ERROR. *Law of case. Former appeal. Statements in
former opinion.*

A statement in the opinion of the court on a former appeal, in a
suit on a life insurance policy, wherein a judgment for the plain-
tiff, predicated of a peremptory instruction, was reversed:—

(*a*) Announcing that the question whether the insured misrepre-
sented in his application for insurance any mätter material to
the risk should have gone to the jury did not become the law of
the case, requiring the jury to pass on the materiality of the evi-
dence; and one

(*b*) Affirming that it could hardly be doubted that, if insured had
fully disclosed the character of an illness the company would not
have insured him, did not become the law of the case, precluding
a finding that there had been no material misrepresentation by
insured in his application.

**2.** LIFE INSURANCE. *Application. Misrepresentations. Questions for
jury.*

In an action on a life insurance policy, defended for misrepresenta-
tion in the application respecting a former illness, whether in-
sured sufficiently went into the details of his illness, where he
disclosed in general terms the nature of the malady; and whether
a misrepresentation might reasonably have influenced the in-
surer in issuing the policy; are questions for the jury.

**3.** SAME. *Constructive notice.*

Notice given by an applicant for life insurance to the company that
he had previously had an attack of insomnia and nervousness,
necessitating the attendance of a physician and confinement in a
sanitarium, charged the company with knowledge of the symp-
toms and consequences usually and reasonably resulting from
such attacks.

---

* This case was heretofore in the supreme court; the decision on the
first appeal is reported in this volume, *ante*, p. 18.

4. SAME. *Action on policy. Instruction.*

    In an action on a life insurance policy, the question, whether a mis-representation by the insured in his application respecting a previous illness might have influenced the company in issuing the policy, being for the jury, an instruction, authorizing a recovery by plaintiff upon a finding that insured made no untrue statement, constituting a misrepresentation material to the risk, does not warrant the reversal of a judgment in plaintiff's favor.

FROM the circuit court of, first district, Hinds county.

HON. WILEY H. POTTER, Judge.

Mrs. Miazza, appellee, was plaintiff in the court below; the insurance company, was defendant there. From a judgment in plaintiff's favor for the full sum due on the policy of insurance sued upon, the same having been upon the life of her deceased husband, Peter Miazza, the defendant appealed (its second appeal), to the supreme court. The facts, necessary to an understanding of the decision, are stated in the opinion of the court.

*Alexander & Alexander,* for appellant.

After the cause was remanded, it was tried on the same evidence, except that the case for the defendant was made much stronger by the introduction of the testimony of Dr. Hunter, Dr. King, the chief medical examiner of the company, and Ragland, and Anderson, the local representatives of appellant company. The testimony of Drs. Hunter and King is clear and explicit that the disease or ailment from which Miazza suffered was material to the risk, and that, had a full and complete disclosure been made in regard to it, the application would never have been approved or the policy issued.

The court below misconstrued the purport and effect of the following language in this court's former opinion:

"The question should have gone before a jury to determine whether or not there had been any misrepresentations by Miazza in his application for insurance of a matter material to the risk, and this testimony was relevant and competent on that point."

This court was not dealing with the case made by the completed testimony. It was not even dealing with the effect of the testimony contained in the depositions. Certainly the court did not mean by this phrase of the opinion to hold that on the testimony contained in the depositions unrebutted, it was still a question whether the disease or ailment was material to the risk, and whether the misrepresentation as to the consultation and attendance of physicians was material. With the depositions held competent and introduced, it was still held open to plaintiff to overcome, if possible, the effect of the testimony.

The court did however express its *view* as to the weight and sufficiency of the testimony contained in the depositions, for in a subsequent paragraph it stated:

"In this case it can hardly be doubted that if there had been a full disclosure on the part of Miazza as to the character of his illness in 1903, it might have reasonably influenced the company not to make the contract of insurance."

On the second trial it was shown that a full disclosure "might have reasonably influenced the company" and further that it certainly would have caused the rejection of the risk.

It is inconceivable how it could ever be said that any sickness is immaterial to the risk when it is sufficient to cause death and does cause death. The *risk* that is in contemplation of both parties when the application is given and accepted, is that they are dealing with the chances of longevity. How can there be any question about whether a disease might reasonably shorten life, when, in fact, it has already caused death? The only witness for the plaintiff, Spengler, testifies that Miazza had a previous attack of the *same* trouble in Memphis in 1903; that it was a similar attack to that from which he died. The authorities are uniform to the effect that where the cause of death is directly related to the fact or condition misrepresented or concealed, the policy must be declared void. 3 Cooley's Briefs on Insurance Sec. 2183, and cases cited.

Misrepresentations in regard to health, though not related to the cause of death, avoid a policy. *Ib.*

Such was the ruling of the court in *Co-operative Association v. Leflore,* 53 Miss. 1.

Equally difficult is it to conceive how it can be thought to be immaterial that there was a concealment in regard to the consultation and attendance of physicians. Miazza did not disclose the name of any one of the three physicians that attended him. Statements as to the consultation and attendance of physicians are warranties material to the risk, and if false avoid the policy. 3 Cooley's Briefs on Insurance, Sec. 2156 and cases cited.

Questions as to these matters subserve the two-fold purpose of showing the general condition of the applicant's health, and at the same time they furnish data by which his statements as to his health may be confirmed. *Ib.*

Even in Pennsylvania, whose broad and liberal statute appellee sought to invoke, the court holds that misstatements as to the consultation with or attendance of physicians are material to the risk. *Lutz v. Metropolitan L. Ins. Co.,* 116 Pa. 527; *Wall v. Royal Society,* 179 Pa. 355; *Mengel v. N. W. Mutual L. Ins. Co.,* 176 Pa. 280. Statements in an application that one physician was consulted, is not a warranty that there were others. *Brady v. United L. Ins. Co.,* 60 Fed. 727 (9 C. C. A. 252); *Weil v. New York Life,* 47 La. Ann. 1405.

We are unable to understand why the court below refused the first instruction for the defendant, since it is in strict conformity to law. It simply directed the jury to find for the defendant if Miazza failed to make a true and full and complete disclosure of the Memphis physicians who attended him in his attack in 1903.

It was clearly error to give the first instruction for plaintiff, to put the burden of proof upon defendant to show that the statements in the application were *made* by Miazza, and that the statements were material to the risk. The burden was on the defendant to show that the statements were untrue; this burden was assumed. While ordinarily the burden is on the de-

fendant to show a breach, the burden of showing that the disease was trivial, ought to be and is on the plaintiff. 3 Cooley's Briefs on Ins. Sec. 2168.

The second instruction for plaintiff announces a rule of law not found in any text-book or decision. It is not necessary for an insurance company which has shown misrepresentations in a material matter, to show that it was injured by it; it is sufficient to show that it would not have issued the policy but for the misrepresentation, or to show that the misrepresentation was as to a fact which might have reasonably influenced its action at the time. It is not true that it lies with an applicant who has made misrepresentations to say that they were substantially true and have not injured the company.

The third instruction is plainly erroneous because it gives emphasis to the apparent recovery from the Memphis attack, whereas the very fact that Miazza died from the same complaint shows that it *did* substantially increase the risk of his early death. It should have been left to the jury to determine the fact of whether the Memphis sickness, if disclosed, would have caused the rejection of the risk.

No question of waiver is now involved. No question of acquiescence growing out of the alleged knowledge of Ragland or Dr. Hunter or Anderson, the agents of the company, is presented. The only questions are first, there were no misrepresentations, and second, that they were not material to the risk.

It is significant that counsel for plaintiff introduced no evidence to impeach or contradict the testimony of the Memphis physicians or the testimony of Drs. Hunter and King. If the ailment described by the Memphis physicians was in fact trivial, surely it was in the power of plaintiff to find some physician or even layman to so testify. It stands unimpeached and uncontradicted, and there ought to have been a peremptory instruction for the defendant.

Insurance companies still have some rights, and it is not true that when they are sued all presumptions are against

them, and that the ordinary rules of pleading and practice are not applicable.

*McWillie & Thompson,* for appellee.

Bearing in mind that the defendant had the burden of proving to the satisfaction of the jury both the existence of the misrepresentations and their materiality to the risk, we beg a brief consideration of the evidence, first as to the existence of the misrepresentations, assuming for the sake of argument that the jury had before them the duly proved original application. What were the misrepresentations in the application ruled on by defendant? They are the following answers given to questions which were presumably propounded orally as they do not appear in the instrument:

4th. That I have never had or been afflicted with any sickness, disease, ailment, injury or complaint. (This in print). I had yellow fever in 1878. Oct. 1903, was overworked, was doing both day and night work, and had insomnia and nervousness for about two weeks—full recovery, no symptoms since. (This in writing).

5th. The last physician I consulted or who prescribed for me was Dr. (This in print) J. B. Stanley of Memphis (This in writing), about (This in print), Oct. 1903 (This in writing), for the sickness here stated, insomnia and nervousness. See No. 4.

The defendant's contention is that Dr. J. B. Stanley was not the last physician who was consulted by or prescribed for the insured and that the representation of the insured as to the nature of his trouble in October, 1903 was false because it was temporarily manifested in mental derangement and he was confined for a short time in Dr. Petty's sanitarium, and these facts were not mentioned.

A reference to the testimony of Ragland, who claimed to have taken the application as state agent of defendant, shows that he did not pretend to have taken down what the insured

said but only what he understood at the time to be its substance and did not show that the application mentioned by him was ever read over to or signed by the insured. It seems that there are two Stanleys in Memphis, R. S. the father, and J. B. the son, and the father testified that he was consulted by and prescribed for the insured and the son that he did not, both of the Stanleys being resident guests of the hotel kept by the insured at the time. If Ragland only wrote down the substance of what he understood the insured to say might it not have very easily happened that while the insured mentioned the son, he gave the name of the father by his proper initials as the last physician who was consulted by or prescribed for him?

The court will observe that the question relates to the last physician who was consulted by or prescribed for the insured, and this is ambiguous. If one physician was the last who was both consulted by and prescribed for the applicant he alone would be the person inquired of, but it does not follow that where one physician was the last consulted by the applicant and another the last who prescribed for him, that both were inquired of. The inquiry is in the singular number and alternative form and would be satisfied by stating the name of the last physician who either was consulted by or prescribed for the applicant; or at least the applicant who presumably was neither a metaphysician nor an etymologist might reasonably take that view of the matter. Prescriptions are sometimes given where there has been no consultation, and the inquiry recognizes this fact. If there has been consultation, however, information as to that was preferable and the applicant was only called on to state the last physician who prescribed for him in case he could not name any physician as the last one he consulted.

It is not pretended that the insured ever consulted Dr. Petty, it being shown on the contrary that he was carried to that gentleman's sanitarium against his will. Dr. Turner's testimony shows merely that Dr. Stanley called him in consultation when

the applicant was as he put it "totally deranged." He merely advised with Dr. Stanley at Stanley's request. The insured said that the last physician he consulted was Dr. Stanley, giving his initials as J. B. those of the son, while the deposition of Dr. R. S. Stanley says he was the man, and that of Dr. J. B. Stanley that he was not. We are unable to believe that it was. of any consequence that these initials were wrongly given, when the patronymic and place of residence of the doctor were correctly given, and the place and time of the ailment were also correctly given, and especially, as we shall presently show, the defendant was not misled to its prejudice. The testimony of both of the Stanleys on this subject was gravely brought in question by information from a most unexpected source after the case went back for a new trial.

The defendant took the deposition of its medical director, a Dr. King of Philadelphia, when by a chance shot on cross-examination it was learned that on receipt of the application Dr. King addressed a letter of inquiry to Dr. J. B. Stanley of Memphis in regard to the nature, date, duration, etc., of the sickness for which he attended the applicant.

This letter was on one side of a single page and was partly written and partly printed, a form being used. The latter portion of it contained specific inquiries as to the above matters to be answered by Dr. J. B. Stanley as the attending physician of the applicant at the time inquired of. This sheet was returned to Dr. King in due course of mail with the questions duly answered as to the ailment of the date mentioned and no other physician was named as having attended except Dr. Petty who had him at his infirmary. These answers were not signed but were made in response to inquiries addressed to Dr. J. B. Stanley as the applicant's attending physician. There was no attempt on the part of the defendant to show that Dr. R. S. Stanley wrote these answers or otherwise to explain the conflict that they gave rise to when treated as the answers of Dr. J. B. Stanley. So much for the alleged misrepresentation as to the last physician.

Can it be said that there were any misrepresentations as to .any sickness, disease, ailment, injury or complaint the applicant had ever had or been afflicted with arising out of his failure to state that he was demented for a brief period at the time which he referred to as one of sickness from insomnia and nervousness. On this point we beg the court to recur to the statement of Ragland that he only put down in the application the substance of what he understood the applicant to say and that Dr. Hunter, who like Ragland made no mention of the applicant having gone to a sanitarium in the answers given to him or his report embodying the same, stated in his testimony that as a matter of fact the applicant did tell him that he was at the time in question in a Memphis private sanatorium, which the testimony distinguishes from a lunatic asylum. It is extremely questionable on this showing whether it can be said that he failed to disclose that he had been at the sanatorium, but if he asnwered truthfully as to his sickness, disease, etc., we do not see that it was any more a necessary part of his answer to state that he was in a sanitorium than he occupied an upstairs room instead of a downstairs one, or a double bed instead of a single one.

We have always believed, on the principle of *noscitur a sociis,* that the words "sickness, disease," etc., as used in the inquiry as to the applicant's past condition meant just what the same words signified when used in reference to his present condition, that is to say, physical ills, since no one would ask a person with whom he was about to contract whether or not he was insane. This view is strengthened by the fact that in the inquiry as to family history the matter of the "insanity" of relatives is expressly inquired about. The insurance people knew the right word when they had occasion to use it.

Moreover, the testimony of Dr. Hunter, an expert witness for the defendant, showed that the temporary mental derangement of the applicant was not a sickness, disease, etc., but only *a symptom* of such physical trouble. He showed that the sickness was

shattered nerves that might be evidenced by tremulousness and other physical signs or by mental derangement, the manifestation in the one case being physical while in the other reason for a time was driven from her throne.

Recollecting that we are talking about sickness, disease, etc., and not what Dr. Hunter shows to be merely their *symptoms,* we beg to call attention to the testimony of the defendant to the effect that the insured was suffering from exactly the sickness, disease, etc., which he mentioned in his application, that is to say, nervousness and insomnia.

As to nervousness, we find that Dr. Petty says he was in a nervous condition, and Dr. Turner says he suffered from shattered nerves. As to insomnia, Dr. Petty says he gave him sedatives to induce rest, and Dr. Stanley says he was suffering from insomnia and he gave him hydrate of chloral and tried to get him to sleep. Dr. Turner said he showed *the effects* of insomnia.

Dr. Petty also confirmed the statement of the insured that he had entirely recovered by stating that his attack was temporary and his cure complete. The report and testimony of Dr. Hunter, the local medical examiner of the defendant at Jackson, fully confirms the testimony of the insured as to his complete recovery. The circumstance that the insured in this case per sistently disputed the fact of his derangement while he did in fact talk wild, shows that as the insurance company well knew, it was folly to ask one to contract as to his own present mental condition, and that when the same words are used in asking him as to his past condition and they do not necessarily or even ordinarily relate to mental ills, they should be treated as relating to physical ills only. It is a well-known fact that the victims of temporary mental alienation almost universally deny in the utmost good faith the fact of their derangement both at the time and afterwards, and, with this fact before us, it is hard to believe that any insurance concern would be so base as to set a trap in its application for those who had been so afflicted, especially

where the words themselves and their association with the same words elsewhere used in the application suggest a different construction.

We leave this subject of the existence of the alleged misrepresentation as to the malady from which the insured suffered with this reminder that he certainly gave the patronymic of the last physician and that it was a matter for the jury whether he did not in fact give his full name, that he gave the time and place of its occurrence and mentioned the specific maladies from which defendant's witnesses say he suffered, insomnia and nervousness, that while defendant's soliciting agent only gave in the application the substance of what he understood him to have answered, did not mention that he had been in the Memphis Sanitarium, the defendant's medical examiner who also did not mention that the insured had been in the sanitarium stated on the witness stand that the insured in reality did mention the fact. The report of this medical examiner says that the insured besides going to an infirmary, "had a nervous spell in Oct. 1903. He had leased a hotel in Memphis, Tenn., and invested all his money in same, saw failure staring him in the face, and became quite nervous and was troubled with insomnia for three weeks." Here were business cares and troubles that brought about insomnia and nervousness, these in turn resulting in the mental breakdown that caused him to be sent to the sanitarium. What more could be expected of an applicant who was not a physician, and who was trying to tell the truth and did not believe he had ever been insane.

Turning now to the subject of the materiality of the alleged misrepresentations, we beg to submit that it can make no difference what were the initials of the Dr. Stanley who was consulted by and prescribed for the insured unless by giving the wrong initials the insured misled the defendant to its prejudice. His patronymic and place of residence were given together with the date of treatment, and the result proved that the defendant was not in the least misled because an inquiry of Dr.

J. B. Stanley, the name given, promptly developed the fact that the insured had at the time mentioned suffered from acute mania. The defendant on the information given by the insured and presumably from the physician named by him got all the information that was asked at the hands of the physician supposed to have been the one last consulted by the insured.

The insured stated that he was laboring under a great mental strain and suffered from the insomnia and nervousness that sent him to the infirmary, and we cannot assent to the proposition that he had to give all the effects or symptoms of those disorders, and among others that his mind was wandering, which was about all of his mental trouble at that time as he was simply talking wildly, was not violent or dangerous and recognized his friend Mr. Spengler. He also stated that he had yellow fever in 1878, and it can hardly be doubted that he was then out of his head, but it was not pretended that he ought to have known and stated that his physical malady then affected his mind. That he had completely recovered is shown by the testimony of defendant's witness Dr. Hunter, and his report as medical examiner, and he had afterwards proved so efficient as an hotel man that when the Norvelle Hotel at Jackson burned down, his employer took him back to Texas with him, engaging him for his hostelry at Dallas. It is quite a strain upon credulity to believe and there is no reason to think that the jury believed the risk would have been rejected if the company had known of his transient dementia in Memphis.

Clearly the jury were warranted in treating the failure to mention the temporary dementia as immaterial when the defendant itself did so. The defendant evidently did not base its action on what the last attending physician might say before it heard from him nor on what he did say after he had answered its inquiry. The inquiry was made of Dr. Stanley on January 18, 1906, without hearing from him the policy was issued and sent to Ragland, state agent, at Jackson, for delivery to him. This policy was not sought to be cancelled until March 14, 1906,

five days after the death of the insured, although a few days af-
ter January 18, 1906, the response to the inquiry addressed to
Dr. Stanley showed that the insured had suffered from "acute
mania" during the sickness in question. It will be noticed that
the astute Dr. King, who is so careful to give some dates, re-
frains from saying on what date he received the answer of Dr.
Stanley showing that the insured had suffered from acute
mania, and it is not improper to assume that he received them a
few days after January 18. It is claimed that he wired to Rag-
land to withhold the policy and that the latter had already de-
livered it, but this telegram was never produced and Ragland,
moreover, fixes the date of it as January 29, two days after he
had delivered the policy. If this matter was so important, why
was the message to withhold a policy sent out for immediate de-
livery so long delayed, assuming that one was in fact sent?
And if it was known on January 29, 1906, that the policy had
been delivered, why was the matter allowed to stand in that
shape until after death of the insured nearly two months later?
It is said by Dr. King, who once more balks on a date, that he
"then" (meaning at some indefinite date after hearing from
Dr. Stanley) referred the matter to one of the inspectors to ob-
tain full information *from Mr. Miazza,* but as the inspector was
unable to find him he caused a notice of cancelation to be mailed
to him, Miazza being then dead. As the cancellation grew out
of and is so closely connected with the inability of this inspector
to find the party, it would appear that the inspector was per-
haps not turned loose until after Miazza's death, and that he
could not find him because his place knew him no more. It
could hardly have been while he was in Dallas, for Ragland and
Spengler show that the former, who was defendant's state agent,
knew the insured was in Dallas, and had in the latter part of
January delivered his policy to him at that point through the
mail. To say that an insurance inspector, one of a very shrewd
class, could not find a man engaged in the office of one of the
hotels of Dallas, who regularly received his mail at that point,

can only be accounted for by concluding that his failure to see him had the same reason that caused Mr. Weller to fail to see his father in the court room on the trial of the immortal Pickwick, that is to say, an absence of all desire to see him.

The jury were not bound to swallow such stuff as this, and were well warranted in concluding that the defendant did not itself regard the alleged misrepresentation as material. Indeed, the whole matter was one for the determination of the jury both as to the existence of the alleged misrepresentations and their materiality to the risk, and the testimony was not of that clear and satisfactory kind that bound the jury to find either question for the defendant; it was not of the kind that necessarily coerces belief.

The instructions submitted these questions fairly to the jury.

Argued orally by *James A. Alexander* and *C. H. Alexander,* for appellant, and by *T. A. McWillie,* for appellee.

FLETCHER, J., delivered the opinion of the court.

This case is before the court for the second time. On the first trial in the circuit court a peremptory instruction was given in favor of the appellee, mainly upon the ground that the insurance contract was to be construed according to the laws of Pennsylvania, in which state a misrepresentation will not avoid the policy, unless made with knowledge of the falsity of the representation. This court reversed the judgment, holding that the contract must be construed according to the laws of Mississippi, and that evidence tending to show that the representations were untrue was competent. It was further held that representations material to the contract have the force of warranties in Mississippi, but that representations in regard to immaterial matters will not defeat a recovery. *Fidelity Mutual Life Ins. Co. v. Miazza, ante* p. 18, 46 South. 817. Upon the remanding of the case to the circuit court, it was tried anew, some additional evidence being introduced, and the issues were submitted to

the jury, resulting in a verdict for the plaintiff, from which the insurance company prosecutes this appeal.

It is insisted on behalf of the appellant that the court erred in submitting to the jury the question of whether the alleged misrepresentations by the insured were or were not material. On the other hand, appellee insists that the law of the case was settled in the former opinion, and that certain language therein contained requires that the jury shall pass on the materiality of the testimony. That language is as follows: "The question should have gone to the jury to determine whether or not there had been any misrepresentation by Miazza, in his application for insurance, of a matter material to the risk." We do not think that this language can be so construed as to hold that it was in this case necessarily the province of the jury to pass upon the materiality of the testimony. The language merely holds that it was for the jury to say whether the misrepresentation shown to be material was in fact made by the assured. We think the language of the opinion leaves it as an open question whether or not the jury should have been given the right to decide as to the materiality of any particular misrepresentation. The appellant, on the other hand, insists that the former opinion strongly intimates, if it does not positively decide, that the case was one for a peremptory instruction, unless the testimony of the Memphis physicians should be overthrown. They base this contention upon the following language used in the former opinion: "In this case it can hardly be doubted that, if there had been full disclosure on the part of Miazza as to the character of his illness in 1903, it might reasonably have influenced the company not to make the contract of insurance." And so, responding to what counsel conceived to be the view of the court as thus expressed, the insurance company offered evidence to the effect that, if the chief medical examiner of the company had known all the facts testified to by the Memphis physicians, the policy would never have been issued. We think that this excerpt from the opinion does not indicate that the jury was without power to hold that

there had been no material misrepresentation of fact.  It will not do to say that an insurance company can change an immaterial misrepresentation into a material one merely by having its medical men assert that, had they known all the facts, the contract would not have been completed; and the opinion intimates as much, since it is said that "it might reasonably have influenced the company."  It is evident that the question of whether it might have influenced the company was essentially a question of fact for the determination of the jury.  We think, therefore, that the former opinion in this case does not decide either way the questions which are now pressed upon our attention.  We are, therefore, left free to decide these questions upon the present appeal.

Miazza, in making application to the company, and in his medical examination, and in his statement to the company's local examiner, stated substantially that he had been sick in Memphis in the year 1903; that he was at that time doing both day and night work, had insomnia and nervousness for two weeks, and was attended by Dr. J. B. Stanley, and that he was troubled with insomnia for three weeks.  He further stated to Dr. Hunter, the company's examining surgeon, that he had been treated in a sanatorium in Memphis.  So far these statements were absolutely true.  It appears, however, from the testimony of the physicians in Memphis, that this disorder was accompanied by acute dementia; that he was nervous and in a very anæmic condition, amounting to profound autointoxication.  This malady, however, yielded to treatment, so that in four days Miazza was wholly restored to reason, and after discharge from the sanatorium was ultimately restored to what appeared to be perfect health.  We are not able to say, as a matter of law, that the disclosure made by Miazza was not full and complete in any reasonable or substantial sense.  The company was notified that he had an attack of insomnia and nervousness, necessitating the attendance of a physician and his confinement in a sanatorium; and the company must be charged with knowl-

edge of the symptoms and consequences which usually and reasonably result from such an attack.   There is no showing here-that the appellant's dementia and autointoxication existed in-dependent of the insomnia and nervousness, of which notice was given, and we are not able to say that these phenomena are anything more than symptoms of the illness disclosed.   It is a matter of common knowledge that temporary dementia may attend many ordinary ailments.   Indeed, it is not unusual for patients suffering from typhoid fever or pneumonia to manifest all the symptoms of a deranged person during the continuance of the illness in its most critical stages, and yet it would be un-reasonable to hold that an applicant for life insurance must dis-close all the peculiar derangements which attend an attack of one of these serious ailments.   And so we conclude that the question was properly left to the jury to say whether the dis-closure made by Miazza was or was not in reality a full and complete disclosure as to his illness in Memphis.

In this sense it was not reversible error for the court to give an instruction that the jury should find for the plaintiff if they believed that the applicant had made no untrue statements, such as to constitute misrepresentations which were material to the risk.   We are not to be understood as holding that in all cases the question of the materiality of the misrepresentations should be submitted to the jury.   We desire to carefully limit this opinion to the facts of this particular case.   We only hold that where there has been a disclosure of this kind, setting out in general terms the nature of the malady, it becomes peculiarly a question of fact for the jury as to whether the applicant has sufficiently gone into details of his illness.   Of course, many cases might be imagined, where there had been no disclosure as to a serious illness, in which a peremptory instruction for the insurance company would be proper; but it is erecting too dif-ficult a standard to say that the applicant in every case must give a detailed history of the illness with which he was afflicted. In this case the insurance company was given instructions by

which the jury was informed that it was the duty of the applicant to make a full and complete disclosure, and, if such disclosure was not made as to facts which would materially affect the risk, then the verdict must be for defendant. We think that this was as much as the company was entitled to under the peculiar facts of this case.

*Affirmed.*