**James E. MATTOX, Individually and as Executor of the Estate of Lucille Mattox, Plaintiff,**

v.

**WESTERN FIDELITY INSURANCE COMPANY, Defendant.**

**No. EC87–285–S–D.**

United States District Court,
N.D. Mississippi, E.D.

Sept. 8, 1988.

Ralph Holland, Thomas A. Wicker, Holland, Ray & Upchurch, P.A., Tupelo, Miss., for plaintiff.

John H. Dunbar, Holcomb, Dunbar, Connell, Chaffin & Willard, Oxford, Miss., for defendant.

## OPINION

SENTER, Chief Judge.

This cause is before the court on cross motions for summary judgment. The case involves allegations that Western Fidelity wrongfully denied claims which were filed by the plaintiff to recover under a major medical policy for expenses incurred during his wife's hospitalization. The defendant seeks summary judgment that it was justified in denying the claims and rescinding the policy due to material misrepresentations made by the Mattoxes or, alternatively, that it did not act in bad faith in denying them. The plaintiff seeks summary judgment that he is entitled to recover damages for breach of contract as well as compensatory damages for mental distress and punitive damages due to the tortious nature of the breach of the contract.

## FACTS

On June 10, 1986, James Mattox applied for a major medical policy to cover himself and his wife, Lucille. The application was completed by Keelan Overby, soliciting agent for Western Fidelity, in the office at the Mattox's store and was signed by Mr. Mattox. The Mattoxes already had a poli-

cy in effect with another company when Mr. Overby solicited their business. Mr. Mattox agreed to take the new policy when Overby convinced him that it would save him "a little over seventy three dollars ($73.00) a month." Overby advised the Mattoxes to keep their other policy in effect until they heard from Western Fidelity that their application had been accepted. They followed his advice.

Questions on the application form required the applicant to reveal certain information about the medical history of each person who was to be insured under the policy. There was a single blank space provided for the applicant to fill in the name of his family physician. Mr. Mattox says that he gave Overby the names of three physicians—two that he had consulted and his wife's gynecologist, Dr. Swan Burrus. The latter was the only name that Overby wrote down on the application. Question # 9 of the application asked: "Are you and all members [sic] now in good health and free from any physical or mental defect?" The answer shown on Mr. Mattox's completed application is yes. Question # 10 asks: "How many times have you or any member been confined in a hospital within the past 3 years?" This question is answered no. Question # 11 asks: "Have you ever had any disease or disorder of the following? (a) Heart, circulatory system, eye, ear, nose, throat, lungs, prostate, stomach, bladder, intestines, appendix, back or spine? (b) High blood pressure, paralysis, arthritis, cancer or tumor, diabetes, hernia, female disorder, gallbladder, liver, goiter, or rectal diseases? ... (f) Any other medical or surgical advice or treatment or operations in the past?" Each of these subquestions is answered no. Mr. Mattox claims that Overby never asked him any of these questions about specific maladies. According to Mattox, he was asked only whether he and his wife were in good health, had ever been confined to a

hospital, and if they had any medical problems. However, Mr. Mattox did sign the application and place his initials beside questions 9, 10, and 11 after the application form was filled out. In response to the general questions about his wife's health, Mr. Mattox asserts that he told Overby about his wife's history of mild hypertension. This contention is apparently undisputed by the defendant.[1] In fact, the defendant proposed that the court find this as a fact.

Answers to questions posed on the application also informed Western Fidelity that the Mattoxes had another policy with another company which they intended to cancel upon acceptance of their application by Western Fidelity.

Upon receipt of the application by Western Fidelity, David Collett, the company's chief underwriter, noting that both of the Mattoxes were in their sixties, requested copies of their medical records from the doctor shown on the form to be their family physician. This was standard practice for any applicant over fifty years of age. In response to Collett's request, Dr. Burrus forwarded copies of Mrs. Mattox's records with a note to the effect that his clinic did not treat men. Neither Mr. Collett nor anyone else at Western Fidelity ever sought any further information on the medical history of Mr. Mattox, although Collett was well aware that the company had nothing other than the application to go on in determining whether he was insurable as a standard risk.

The records forwarded by Dr. Burrus clearly revealed that Mrs. Mattox had been treated by Dr. Max Taylor for elevated blood pressure and had been given medicine (Corgard) to control the condition. This record revealed blood pressure readings of 140 over 80 on January 6, 1982, and again on August 26, 1983, and of 130 over

---

1. In his deposition, Mattox asserts that he gave this information to Overby. Throughout the briefing of this case both in briefs submitted in opposition to the defendant's summary judgment motion and in briefs supporting his own motion, the plaintiff has insisted he told Overby about his wife's hypertension. Paradoxically, stipulation 22 is to the effect that Mattox never reported his wife's "history of high blood pressure." The paradox is lessened by a close reading of Mr. Mattox's deposition in which he insists that hypertension and high blood pressure are not synonymous terms.

80 on April 12, 1985. In his deposition, Mr. Collett admits that he was aware that Mrs. Mattox had been treated for high blood pressure when he decided to issue the policy. The underwriting procedure adopted by Western Fidelity required that any evidence of high blood pressure be fully investigated before a policy could be issued. This investigation was to consist of a review of the records of the attending physician. However, no attempt was made by Collett or anyone else at Western Fidelity to obtain records from Dr. Taylor prior to acceptance of the application. A policy was issued on or about July 16, 1986.

On November 24, 1986, Mrs. Mattox consulted Dr. Taylor, complaining of a general feeling of malaise and of diarrhea. A blood test revealed that Mrs. Mattox's white blood count was extremely high. Tentatively diagnosing Mrs. Mattox's problem as leukemia, Dr. Taylor referred her to Dr. Spencer Schreiter. Dr. Schreiter's diagnosis was that Mrs. Mattox was suffering from chronic lymphocytic leukemia. In December, the chronic leukemia became acute and Mrs. Mattox was hospitalized. On January 12, 1987, Lucille Mattox succumbed to the leukemia and died. There is no contention that her leukemia predated the issuance of the policy. In fact, the parties have stipulated that no symptoms of leukemia were manifested until approximately two weeks before the disease was diagnosed. The hospitalization and chemotherapy treatment resulted in a bill from North Mississippi Medical Center in the amount of $40,283.51. Doctor bills and other charges brought the total to $48,-981.40. Mr. Mattox filed a claim for payment with Western Fidelity on January 23, 1987.

The claim was processed by Connie Mueller, a claims examiner for Western Fidelity. Additional hospital and medical records concerning both this claim and Mrs. Mattox's prior medical history were requested and received. Based on her analysis of these records, Ms. Mueller approved the claim. This approval was communicated to Mr. Mattox by Ms. Mueller when he called concerning the status of his claim. According to Mattox, Ms. Mueller told him that the check was ready and awaiting the signature of the company president.

At the time this claim was processed, Western Fidelity was following a policy of having every claims decision reviewed by its president, Leland Kohutek. This policy had been instituted early in 1986 due to a complete turnover of personnel in the claims department. The company's written claims handling procedure requires that when a decision to deny a claim due to misrepresentation is made, the file, along with a list of the apparent misrepresentations, should be forwarded to the chief underwriter. If any medical records in the file indicated treatment by doctors whose records were not in the file, those records were to be requested. The chief underwriter was then to "prepare a written memorandum stating what the underwriting decision on the application would have been had all of the prior medical history been disclosed in the application." This memo was to list the grounds for the decision by reference to specific portions of underwriting manuals used by the company. The company does not contend that this procedure was followed when Mr. Kohutek reviewed the Mattox claim.

In his analysis of the file, Mr. Kohutek's attention was drawn to two entries in the records from Internal Medicine Associates. On September 22, 1980, the following entry was made:

> *Everything is normal* and she is much relieved. Give her Bentyl to take pvn and also weight loss booklet. Return in 2 months. I have instructed her to lose weight. *Blood sugar was 134 and this is borderline.* (Emphasis added.)

On April 12, 1985, the results of a blood test administered, according to the report, because the patient was concerned about a family history of colon cancer and stomach cancer showed that she had a "slightly elevated blood sugar of 123." Neither Mr. Kohutek nor anyone else at Western Fidelity made any further investigation concerning these two blood sugar entries either prior to or following the decision to rescind the policy. Mr. Kohutek's review of the file also turned up blood pressure readings

of 160 over 80 on March 7, 1983; 180 over 110 on October 23, 1984, and 140 over 88 on November 13, 1984. None of these readings had been seen by Western Fidelity's underwriters when the policy was issued.

According to Mr. Kohutek, when he discovered this "history" of blood sugar problems coupled with high blood pressure, he sent the file to David Collett and asked him what the company's decision would have been if this information had been known at the time the application was received. Collett, however, does not recall that events transpired that way. He remembers only that Mr. Kohutek asked him a hypothetical question about an applicant with a combination of high blood pressure and diabetes or high blood sugar. Collett told Kohutek that they would not insure such a person. Mr. Collett was not given the Mattox file to review at that time. In fact, according to his deposition testimony, Collett did not see the Mattox file from the time the initial decision to issue the policy was made until a week or so before his deposition was to be taken in this case. None of this is in keeping with the company's own written procedure for reviewing claims.

The decision to deny the claim and rescind the policy was finalized on April 22, 1987, three months after its submission. According to Mr. Kohutek, the decision to rescind coverage was based on the combination of elevated blood pressure and elevated blood sugar.

### Material Misrepresentation

Under Mississippi law, a material misrepresentation made in applying for an insurance policy gives rise to a right in the insurer to rescind the policy. *Fidelity Mutual Life Insurance Co. v. Miazza*, 93 Miss. 18, 46 So. 817 (1908). The fact that the falsity of the statement is unknown to the applicant is of no consequence. Even innocent misrepresentations make the policy issued in reliance on them voidable if those misrepresentations are material to the risk assumed. *Dukes v. South Carolina Insurance Co.*, 590 F.Supp. 1166, 1168–70 (S.D.Miss.1984).

Western Fidelity has enumerated twelve misrepresentations which it alleges were made on the application involved in this case. Stripped of redundancies, these allegations boil down to four essential facts the company claims were misrepresented or concealed.

First, the company asserts that "Mr. Mattox did not tell Mr. Overby about any doctors who had treated his wife in the past other than Dr. Burrus," although he knew that she had been consulting doctors at Internal Medicine Associates. The only question on the application which asks for the name of any doctor is the one which asks for the name of a family physician. There is nothing about this question which suggests that the applicant is to reveal the name of every doctor who has been consulted by any potential insured. Mr. Mattox clearly answered the question posed by providing the name of a doctor who gave his wife an annual physical. Even if the court should find that this was a misrepresentation, David Collett's deposition shows that this information was not material to the risk being assumed. Mr. Collett testified that he was fully aware that he had no family physician information on Mr. Mattox when he received the note from Dr. Burrus stating that he did not treat men. He further testified that as an underwriter, he was not concerned with this lack of information. This testimony belies any contention of the materiality of the representation that Dr. Burrus was Mrs. Mattox's family physician. To entitle the insurer to rescind, the misrepresentations made must affect either the acceptance of the risk or the hazard assumed by the company. Miss.Code Ann. § 83–9–11(3) (1972). Collett says plainly that the lack of any family physician information on Mr. Mattox did not affect the acceptance of the risk. The company cannot now be heard to complain that the failure to disclose the names of more than one physician for Mrs. Mattox was a material misrepresentation entitling it to rescind this policy when its chief underwriter was totally unconcerned that it had no family physician information whatsoever on her husband who was also insured under the same policy.

■ The second alleged misrepresentation occurred when Mr. Mattox told Overby that both he and his wife were in good health. The company has presented no evidence other than the high blood pressure and slightly elevated blood sugar readings to show that the statement that Mrs. Mattox was in good health was a false one. The plaintiff has submitted the affidavit of Dr. Max Taylor, who was treating Mrs. Mattox for high blood pressure. Dr. Taylor states emphatically that Mrs. Mattox's blood pressure problems were not serious and were controlled.[2] In fact, his records reveal that he was considering taking her off the medication. This affidavit also states that if he had been consulted, he would have told Western Fidelity officials that Mrs. Mattox was in good health. As noted earlier, the defendant in its proposed findings of fact admits that in response to the general question concerning the couple's health, Mr. Mattox told Overby that his wife had been treated for mild hypertension. Two blood sugar readings that the defendant admits were within the normal range are not evidence of poor health. The defendant has presented no evidence that two readings of slightly elevated blood sugar over a period of five years suggest that a person is in poor health. In fact, the doctor's report which discloses the highest of these two readings begins with the words "[e]verything is normal."

The third allegation of misrepresentation concerns the statement on the application that Mrs. Mattox did not suffer from high blood pressure. There is no doubt that high blood pressure would be material to the acceptance of the risk. However, there are two alternative reasons why this defense is not available to the defendant.

■ First, under Mississippi law, if the applicant divulges the information, but the agent who fills out the form does not record the information accurately, there has been no misrepresentation. *World Insurance Co. v. Bethea*, 230 Miss. 765, 93 So.2d 624 (1957). An insurance company "cannot avoid the policy because the application for insurance does not fully disclose information given to its agents." *National Life and Accident Insurance Co. v. Miller*, 484 So.2d 329, 334 (Miss.1985). Western Fidelity makes much of the fact that Mr. Mattox signed the application and initialed each of the entries which it claims were misrepresentations. This is of no avail to the company, though, because the signing of the completed application by the insured does not undo the fact that the insured has communicated the information to the agent. *Home Insurance Co. of New York v. Thornhill*, 165 Miss. 787, 144 So. 861 (1932). Absent some proof of collusion between the applicant and the agent, which is not even alleged in this case, the information relayed to the agent is imputed to the company and the company cannot then rescind the policy because it was not told what its agent was told. *See Southern United Life Insurance Co. v. Caves*, 481 So.2d 764, 767 (Miss.1985) (knowledge of agent imputed to company).

■ Alternatively, and more importantly, it is undisputed that when David Collett made the decision to issue the policy covering Mrs. Mattox, he was aware that she was taking Corgard, a medication for high blood pressure. He also had before him the records of Dr. Burrus which revealed that Dr. Max Taylor was treating Mrs. Mattox for high blood pressure.

> An insurer may waive the right to forfeit or rescind a policy of insurance ... by recognizing the validity of the policy and continuing it in force after knowledge of circumstances entitling it to avoid the policy. Most of the cases supporting this rule hold that slight evidence will suffice to support a finding that the insurer waived the right of forfeiture.

*Casualty Reciprocal Exchange v. Wooley*, 217 So.2d 632, 636 (Miss.1969). This principle is clearly applicable in the instant case. If waiver were held not to apply in this situation, an insurance company would be free to issue insurance policies with full knowledge of innocent misstatements by the applicant and collect premiums while

---

**2.** Mr. Collett also said in his deposition that Mrs. Mattox's blood pressure was under control and that he did not consider this to be a problem from an underwriting standpoint.

reserving the right to avoid the policy any time a claim was submitted which was for an amount greater than the accumulated premiums. This result is obviously inequitable. The court holds that by issuing a policy and accepting premiums with full knowledge that the applicant was being treated for high blood pressure and that this information did not appear on the application, Western Fidelity waived the right to rescind the policy for that "misrepresentation."

■ Finally, the company asserts that the representation on the application that Mrs. Mattox had never suffered from diabetes was false. As evidence of this proposition, the company points only to the two isolated reports of elevated blood sugar readings. The company argues that its instructions to its agents define diabetes as "elevated sugar levels in the blood." However, there is absolutely no evidence before this court that even suggests that this definition was ever communicated to Mr. Mattox. It is undisputed—in fact it is stipulated by the parties—that Mrs. Mattox was never diagnosed by a physician to suffer from diabetes nor was she ever treated for diabetes.[3] In fact, the deposition testimony of Dr. Max Taylor, the physician from whose records the elevated blood sugar readings were taken, is that she was never even treated for high blood sugar. The testimony of both Dr. Taylor and David Collett, the company's own chief underwriter, is that both of these readings are at the high end of the normal range. Not only has the company failed to prove that the statement that Mrs. Mattox did not suffer from diabetes was false, it has failed to prove that she "suffered from high blood sugar." So even if the company's in-house definition of diabetes were accepted, Western Fidelity has failed to show that there was a misrepresentation as to this question.

The company has submitted the affidavit of Mr. Collett wherein he insists that Western Fidelity would not have insured Mrs. Mattox if its officers had known of her

history of high blood sugar combined with high blood pressure. In fact, he insists that no company would have done so. Though this statement is relevant to the question of materiality, it begs the essential question of whether there was a misrepresentation in the first place. The actions of the Western Fidelity officials evince a fundamental misconception of the right of rescission. Throughout the course of their dealings with Mr. Mattox, Western Fidelity officials appeared to be of the opinion that if there is something in the "insured's" medical history which would have caused the company not to accept the risk if they had known about it at application time, then the company is entitled to rescind the contract. In fact, stipulation #32 reads: "The reason for the Defendant's decision to rescind coverage for Lucille Mattox was a combination of elevated blood pressure and elevated blood sugar."

■ Although this court has held that there is no duty on the insurer to investigate an applicant upon receipt of the application, *Ross v. Western Fidelity Insurance Co.*, No. EC87–54–S–0 (N.D.Miss. June 29, 1988) (unpublished opinion), that does not mean that the company may, in good faith, wait until a claim is filed and then determine that the claimant was not an insurable risk and avoid the policy. Uninsurability alone is not grounds for rescission of the policy. The company that refuses to investigate until after a claim is filed runs the risk that it has insured someone whom it otherwise would not have. It is indeed true that the company has the right to rely on the information supplied in the application in determining whether or not to accept the risk, *Apperson v. United States Fidelity & Guaranty Co.*, 318 F.2d 438, 441 (5th Cir.1963). However, the company has no right to rescind the policy because there was information, not asked for on the application and not volunteered by the applicant, the knowledge of which would have caused the company to refuse to insure. If the company intends to rely exclusively on

---

**3.** This fact also defeats the defendant's claim that Mattox answered question 11(f) falsely. That question calls upon the applicant to reveal

"(a)ny other medical or surgical advice or treatment or operations in the past."

the application, it should ask questions tailored to elicit all the information that it needs. An applicant has neither concealed nor misrepresented information when he has answered fully and truthfully all the questions asked of him. *Liverpool & London & Globe Insurance Co. v. Delaney,* 190 Miss. 404, 200 So. 440 (1941).

### Summary Judgment

■ Western Fidelity failed to establish that Mrs. Mattox suffered from diabetes and it admitted the facts necessary to establish that it had waived the alleged misrepresentation concerning high blood pressure. Misrepresentation is an affirmative defense which Western Fidelity would be required to prove at trial. *Reserve Life Insurance Co. v. McGee,* 444 So.2d 803, 808 (Miss.1984). The defendant's failure to come forward with evidence to establish matters that it would be required to prove at trial mandates summary judgment in the plaintiff's favor when the basic Rule 56 requirements are otherwise met. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). The court finds that there is no dispute as to the fact that the plaintiff's decedent was an insured under a major medical policy issued by Western Fidelity and that this policy covered treatment for leukemia. The defendant does dispute the amount that is due under the policy, and the plaintiff has not produced sufficient evidence to permit the court to fix the amount on summary judgment. The defendant has failed to establish any defense to liability under the policy or to show that a fact issue exists as to such a defense. Therefore, the court holds that the plaintiff is entitled to partial summary judgment as to the defendant's liability under the policy, but not as to the amount of that liability.

### Compensatory and Punitive Damages

■ Extracontractual compensatory damages are available under Mississippi law for tortious breach of contract including "economic losses incurred as a proximate result of the insurer's tortious conduct and emotional distress damages." *Blue Cross & Blue Shield v. Maas,* 516 So.2d 495, 498 (Miss.1987) (Justice Robertson's concurrence joined by five other justices). *See* also *Eichenseer v. Reserve Life Insurance Co.,* 682 F.Supp. 1355 (N.D. Miss.1988). However, the only evidence tending to show that such damages were incurred in this case is the statement in the plaintiff's deposition that he has had difficulty sleeping at night. This evidence is simply not sufficient to resolve this issue on summary judgment. The court finds that there is a genuine dispute as to material fact on the question of damages for emotional distress.

■ The punitive damages claim is likewise not ripe for summary resolution. Two separate decisions must be made before punitive damages may be awarded in a breach of insurance contract action. First, it must be determined that the refusal to pay the claim was not supported by an arguable reason. "A person is said to have an arguable reason for acting if there is some credible evidence that supports the conclusions on the basis of which he acts." *Blue Cross and Blue Shield of Mississippi v. Campbell,* 466 So.2d 833, 851 (Miss.1984) (Justice Robertson writing separately). The question of whether an arguable reason for the denial existed is generally a question of law to be decided by the court. *Reserve Life Insurance Co. v. McGee,* 444 So.2d 803, 809 (Miss.1983). The undisputed facts of this case are that the insurer claims the right to rescind the policy because of misrepresentations as to the deceased's history of high blood pressure and diabetes or high blood sugar. The defendant knew of the high blood pressure problem when it issued the policy. There is absolutely no credible evidence to support the company's conclusion that Mrs. Mattox was diagnosed as suffering from, or treated for, or advised concerning diabetes. The defendant never asked about high blood sugar, so there was no credible evidence to support its decision that the applicant had made a misrepresentation on this point. The court, therefore, holds that Western Fidelity had no arguable reason for refusing to pay this claim.

A decision that the defendant had no arguable reason does not of itself entitle the plaintiff to an award of punitive damages. It must also be determined that in denying the claim, the defendant "committed a wilful or malicious wrong, or acted with gross or reckless disregard for the insured's rights." *Pioneer Life Insurance Co. of Illinois v. Moss*, 513 So.2d 927, 930 (Miss.1987). These questions are inherently jury questions. The court is not prepared to invade the province of the jury by deciding these issues on summary judgment.

## CONCLUSION

The plaintiff is entitled to summary judgment as to Western Fidelity's liability under the contract, but not as to the amount of that liability. The issues of compensatory and punitive damages will not be resolved on summary judgment.

An order in conformity with this opinion will be issued on this date.