**The STATE LIFE INSURANCE COMPANY**

v.

**Frank A. O'BRIEN.**

**No. 3:94–cv–196BN.**

United States District Court, S.D. Mississippi, Jackson Division.

Aug. 8, 1995.

William H. Creel, Jr., Edward J. Currie, Jr., Currie, Johnson, Griffin, Gaines & Myers, Jackson, MS, for plaintiff.

James G. McIntyre, James G. McIntyre, Jackson, MS, William E. Murray, William E. Murray, Natchez, MS, for defendant.

Frank A. O'Brien, Natchez, MS, pro se.

### FINDINGS OF FACTS AND CONCLUSIONS OF LAW

BARBOUR, Chief Judge.

### INTRODUCTION

This is a Declaratory Judgment action filed by State Life Insurance Company ("State Life") against Frank O'Brien. State Life seeks a declaration that a disability income insurance policy issued to Frank O'Brien is void because of material misrepresentations made by Mr. O'Brien in the application process and because Mr. O'Brien engaged in a scheme to overinsure himself which State Life argues is against Mississippi public policy. The Court held a bench trial on July 17, 1995, and took the case under advisement for rendition of these Findings of Fact and Conclusions of Law.

### FACTUAL BACKGROUND

Frank A. O'Brien applied for a disability income insurance policy with State Life on or about May 2, 1992. The application was submitted through Homer Parker, (Ex. P1) an independent agent unaffiliated with State Life.

Question 4J of the application (Ex. P1) requested information regarding "disability income insurance now in force on applicant," and Mr. O'Brien responded that he had a disability policy with Woodmen of the World Life Insurance Society ("Woodmen") with benefits of "$2,000". Question 4K of the application then asked, "Will policy being applied for replace or change any existing insurance (including long term care coverage)?" Mr. O'Brien checked "yes" and specifically referred to the Woodmen policy.

Question 2C of the application also asked whether Mr. O'Brien had "applied for other life, health or disability insurance within the past six months or contemplate[d] applying within the next six months." Mr. O'Brien checked "yes" and stated that he "applied for life insurance." Mr. O'Brien did not disclose the name of the company, Life USA, with which he had applied for life insurance, or that he was also purchasing disability coverage from Life USA. The life insurance policy for which he had applied with Life USA

had a $1000 per month disability benefit rider. Mr. O'Brien and his securing agent, Mr. Homer Parker, signed the application warranting that all statements in the application were true and correct.

State Life retained Systematic Business Services, Inc. ("SBSI"), who, through its employee, Donna DeBoer, conducted a personal follow-up telephone interview of Mr. O'Brien regarding his application. SBSI is a company serving the life and health and disability insurance industry. It interviews prospective insureds to verify and develop information given by them in applications. (Coffman Dep., pp. 5–6).

SBSI employees are trained and instructed to ask questions exactly as they are printed on the interview form without any deviation. (Coffman Dep., pp. 17–18). The prospective insured's replies are written down verbatim. (Coffman Dep., pp. 17–18). Ms. DeBoer interviewed Mr. O'Brien on May 26, 1992. (DeBoer Dep., p. 8). Ms. DeBoer verified that she was talking directly to Mr. O'Brien by having him confirm his date of birth, address and social security number. She identified herself, and informed Mr. O'Brien the reason that she was calling. (DeBoer Dep., pp. 9–10). In response to Question 19 on the SBSI form (Ex. P11), which asked whether or not Mr. O'Brien had "any other insurance applied for or in force?" Mr. O'Brien stated that he had a policy with Woodmen of the World. In response to Question 19–A Mr. O'Brien then stated that the State Life policy would replace the Woodmen of the World policy. Upon questioning on whether he had any other disability coverage, Mr. O'Brien did not disclose that he had applied for the life insurance policy with Life USA, which had the disability rider. (Ex. P11).

Based upon Mr. O'Brien's representations that he would cancel his Woodmen of the World policy if State Life issued its policy, that Mr. O'Brien had no other disability coverage, and that Mr. O'Brien had not applied for and had no intentions of applying for any other disability coverage, State Life issued policy no. H42028 with disability income benefits of $2,250 per month for the duration of the disability or until age 65. (Ex. P2). The

policy also contained a waiver of premium benefit for the duration of the disability, and a yearly cost of living adjustment. (Ex. P2).

Mr. O'Brien claims to have sustained injuries and disability in a fall at the Wal–Mart store in Natchez, Mississippi, on January 20, 1993. As a result, Mr. O'Brien made a claim under the State Life policy on April 26, 1993. (Ex. P20). The claim form requested Mr. O'Brien to name all hospital and disability insurance he had in effect. Mr. O'Brien, again, did not disclose the existence of the Woodmen policy, the Life USA policy, or a BMA disability policy, but rather listed only a hospital policy. (Ex. P20). State Life discovered that, contrary to the assertions made in his application, Mr. O'Brien did not cancel his Woodmen policy, but rather had increased the disability benefits provided under the Woodmen policy from $1,800 per month to $3,700 per month. (Exs. P7, P8).

The combined benefits of all of Mr. O'Brien's disability income policies totaled $10,450 per month and greatly exceeded Mr. O'Brien's prior income and insurability. If State Life had known that Mr. O'Brien intended not to cancel his Woodmen of the World policy and also intended to apply for more disability coverage, State Life would not have issued its policy to Mr. O'Brien. The other disability policies are discussed in greater detail below since they are relevant to issue as to whether Mr. O'Brien schemed to overinsure himself.

Mr. O'Brien reported net income of $41,000 per year on his application. (P. 1). His actual income was somewhat higher because he paid insurance premiums out of the income of his two businesses, a motel and a pawn shop. Francine Collier, a senior underwriter for State Life, testified that it is the policy of State Life, as well as other companies in the disability insurance field, to insure no more than 60% of an insured's net income, taking into consideration all other disability insurance benefits that insured might have. Total monthly benefits of $10,225 would produce annual payments to Mr. O'Brien of $125,400. This amount would greatly exceed his net income substantiated by the evidence. Under the underwriting policy of the company this total disability

benefit would have required net income of $209,000, much greater than Mr. O'Brien was making, in order for the $10,225 monthly benefit to equal 60% of the insured's net income.

### a. Life USA

On or about April 30, 1992, Mr. O'Brien applied for a life insurance policy with Life USA which contained a rider providing disability coverage of $1,000 per month plus a waiver of premium benefit of $475.00. The Life USA policy was issued on May 28, 1992. (Ex. P6). Homer Parker, Mr. O'Brien's securing agent for the State Life policy, also obtained Mr. O'Brien's Life USA policy. (Ex. P6).

Representatives of Life USA testified that Mr. O'Brien did not disclose to them his disability policy with Woodmen. (Rohe Dep., pp. 11–12). Life USA discovered the Woodmen policy as a result of an interview conducted of Mr. O'Brien by PMS, Inc., retained by Life USA. (Rohe Dep., pp. 13–15, Ex. P25). Cherry Freeman, underwriter at Life USA, testified that she had a conversation with Mr. Parker, Mr. O'Brien's agent, who told her that Mr. O'Brien would cancel the Woodmen policy when Life USA issued its policy. (Freeman Dep., pp. 6–8; Ex. P23).

Neither Mr. Parker nor Mr. O'Brien disclosed to Life USA that Mr. O'Brien had applied for the State Life disability policy. (Rohe Dep., p. 15; Freeman Dep., pp. 7–8; Ex. P5, P23). Mr. O'Brien never cancelled his Woodmen policy, and this fact was not disclosed to Life USA by either Mr. O'Brien or Mr. Parker. In fact, Mr. O'Brien increased the monthly benefit under his Woodmen policy. Further, Mr. O'Brien did not disclose his other disability policies on the disability claim forms submitted by Mr. O'Brien on July 14, 1993, December 17, 1993, and October 21, 1994. (Ex. P23).

### b. Woodmen of the World

Mr. O'Brien, rather than cancelling his Woodmen policy in accordance with his representations to three insurers (State Life, Life USA and, later, BMA), applied for an increase in the Woodmen disability benefits on or about July 27, 1992, and was issued a rider increasing the coverage to $3,700 per month. (Exs. P7, P8). When applying for the Woodmen increase, Mr. O'Brien did not disclose, in response to specific questions on that application, the other disability policies he had in force. (Tripp Dep., p. 21; Ex. P7). Mr. O'Brien also did not disclose the other coverages on the disability claim forms he submitted. (Teegarden Dep., pp. 12, 13, 19–24; Ex. P4).

### c. Business Men's Assurance Company

Mr. O'Brien applied for a disability policy with Business Men's Assurance Company on July 16, 1992, and was issued a policy on September 28, 1992 with disability benefits amount $3,525 per month. (Exs. P9, P10). His selling agent for the BMA policy was Jeanie Lee, who was also his agent for the Woodmen policy. Mr. O'Brien did not disclose any of his other disability policies when applying for the BMA policy and Ms. Lee did not disclose the Woodmen policy about which she had knowledge. (Sheppard Dep., p. 10; Marty Dep., pp. 9–10, Ex. P9). BMA retained the services of SBSI to conduct a telephone interview of Mr. O'Brien. Mr. O'Brien told SBSI that he had a policy with Woodmen of the World with disability benefits of $1,800 per month, which he would replace with the BMA policy (just as he had said to State Life). (Ex. P12). Based upon Mr. O'Brien's representations that the Woodmen of the World policy would be cancelled, BMA issued Mr. O'Brien a policy. (Marty Dep., pp. 18–19; Ex. P10).

Mr. O'Brien made a disability claim under the BMA policy on April 26, 1993, and, again, failed to identify any of his policies except for Woodmen. (Ex. P22).

The misrepresentations and/or withholding of information by Mr. O'Brien and Mr. Parker allowed Mr. O'Brien to obtain disability policies whereby his income would increase threefold by his becoming disabled.

After discovering Mr. O'Brien's misrepresentations, and the other disability policies in force, State Life provided notice that it reserved its rights to contest the validity of the policy, and then contested the claim in accordance with the terms of the policy.

Mr. O'Brien subsequently refused to provide State Life with medical and income authorizations which would allow State Life to obtain information regarding Mr. O'Brien's medical condition and income status. The policy required Mr. O'Brien to provide such authorizations as conditions precedent to benefits under the policy. As a result of Mr. O'Brien's noncompliance and wrongful withholding of information and misrepresentations, State Life ceased providing benefits under the policy.

## DISCUSSION

### 1. The State Life Policy Is Void Based Upon Material Misrepresentations Made By Frank O'Brien.

■ Material misrepresentations made in applying for an insurance policy give rise to a right of the insurer to rescind the policy. *Golden Rule Ins. Co. v. Hopkins,* 788 F.Supp. 295, 301 (S.D.Miss.1991); *Mattox v. Western Fidelity Ins. Co.,* 694 F.Supp. 210, 214 (N.D.Miss.1988). A misrepresentation is regarded as material if it effects either "(1) the acceptance of the risk or (2) the hazard assumed by the company." *Golden Rule Ins. Co. v. Hopkins,* 788 F.Supp. at 301. Although fraudulent misrepresentations certainly give the insurer the right to rescind a policy, that right exists where even an innocent misrepresentation was given to the insurer, the truth of which would have materially affected the risk or caused the insurer to not issue the policy. *Pedersen v. Chrysler Life Insurance Company,* 677 F.Supp. 472, 475 (N.D.Miss.1988); *Dukes v. South Carolina Insurance Company,* 590 F.Supp. 1166, 1167 (S.D.Miss.1984), *aff'd,* 770 F.2d 545 (5th Cir.1985).

■ The evidence in this case clearly shows by a preponderance of the evidence that Mr. O'Brien made several material misrepresentations when applying for the State Life policy. Mr. O'Brien never cancelled his Woodmen of the World policy as he indicated he would, but in fact applied for an increase in the coverage. Mr. O'Brien never disclosed, either to State Life or SBSI, in response to direct questions, that he had applied for other disability coverage with Life USA. Mr. O'Brien's misrepresentations were material to State Life. They directly affected the amount of Mr. O'Brien's insurability, and State Life would not have issued the policy had those representations been truthfully made. Mr. O'Brien cannot recover under a policy that would never have been issued to him.

■ Furthermore, Mr. O'Brien's actions with regard to other insurers show by clear and convincing evidence an intent and scheme to defraud State Life, as well as others. Testimony from all of Mr. O'Brien's disability insurers, Woodmen, Life USA, BMA and State Life, shows that Mr. O'Brien consistently refused to disclose the existence of his other disability policies which he had in effect at the time or for which he had applied, in response to direct questions regarding other policies, applications, and/or his intentions in regard to the Woodmen policy. Mr. O'Brien further stated to State Life, Life USA and BMA that he intended to cancel the Woodmen policy, but in fact increased the coverage provided therein. Mr. O'Brien, when increasing his coverage with Woodmen, did not disclose to Woodmen that he had obtained disability coverage with other insurers.

Mr. O'Brien testified that he only has an eighth grade education, apparently seeking to influence the Court to think that he did not have the capability to contrive the overinsurance scheme alleged by State Life. The Court notes, however, that despite his lack of formal education, Mr. O'Brien has been a very successful businessman. He has owned and operated both a pawn shop and a motel and has compiled a net worth of one and one-half million dollars.

Within a span of less than six months, the scheme of Mr. O'Brien allowed for Mr. O'Brien, with the assistance of Mr. Parker and Ms. Lee, to apply for, and get issuance of, four disability policies, with total benefits amounting to $10,475.00 per month or $125,700.00 per year, tax-free, which is three times Mr. O'Brien's before-tax personal income for the year 1992 (the year of the applications). Even after filing the claims, Mr. O'Brien continued to conceal his other disability insurance coverages, apparently

hoping that all insurers would pay while being ignorant of each other.

■ The actions of Mr. O'Brien in this case show by clear and convincing evidence that he was engaged in a scheme to defraud the insurers and overinsure himself in order to make a significant profit. Misrepresentations made to all of the insurers, both in the underwriting and claims process, clearly show that Mr. O'Brien was attempting to deceive all of his disability insurers, including State Life, for personal profit. Mr. O'Brien cannot be allowed to benefit from a policy which would have never been issued to him but for his misrepresentations. The Court declares the State Life Policy void because of Mr. O'Brien's material misrepresentations in his application therefor.

## 2. State Life Is Not Estopped From Voiding the Policy Because of Any Actions or Knowledge of Homer Parker.

■ Mr. O'Brien alleges that State Life is estopped from voiding the policy since Homer Parker, the agent, had knowledge that Mr. O'Brien did not intend to cancel the Woodmen policy and that Mr. O'Brien applied for disability coverage with Life USA, even though those facts were never disclosed to State Life. State Life argues that neither Mr. Parker's knowledge nor actions can be imputed to State Life since the evidence shows that Mr. Parker at least had knowledge that Mr. O'Brien was giving false answers to State Life and did not disclose it, or that Mr. Parker actually acted in consort with Mr. O'Brien in making the misrepresentations.

Mr. Parker contacted State Life on behalf of Mr. O'Brien seeking to have State Life issue a disability policy to Mr. O'Brien. Mr. Parker was unaffiliated with State Life, and the policy involved in this case is the first and only policy issued by State Life through Homer Parker.

■ In Mississippi an insurance company is ordinarily bound by the knowledge of its selling agent regardless of whether the agent discloses the knowledge to the company. The Mississippi Supreme Court has not directly decided whether an insurance company is bound by the knowledge of its selling agent where that knowledge is intentionally withheld or concealed for purposes of perpetrating a fraud upon the company. Accordingly, this Court must make an *Erie* guess in this diversity case. It finds guidance in the case of *Preferred Life Assurance Society v. Thompson,* 170 Miss. 575, 155 So. 188 (1934). In *Preferred Life,* a prospective insured applied for a life insurance policy while suffering from a heart condition, which would have precluded the policy from being issued. The medical examiner, an agent although not a selling agent of the company, who had been hired by the insurance company to perform a routine medical examination on the insured, falsely represented to the insurer the prospective insured's health condition, with the prospective insured's knowledge.

The Court held that the policy was void because a material misrepresentation was made to the insurer by its own agent, the medical examiner. *Preferred Life,* 155 So. at 189. The Court further held that, although the general rule is that an insurer is bound by its agent's actions and knowledge in the application process, when the agent is acting in collusion with the insured or inserts false answers and the insured knows them to be false, the insurer cannot be held liable. *Id.* The Court stated:

> "It follows inescapably that [the prospective insured] anticipated and expected that the medical examiner would fill out the application with false answers as he did; in other words, that the medical examiner would act in his interest, and against that of the insurance society. To hold that in such a case the medical examiner is the agent of the insurer would be to overrun the reasons which support the general rule that the medical examiner is the agent of the insurer, and would open wide the door for the most monstrous frauds and swindles on insurance companies. In such a case the examiner is acting for, and is the creature of, the applicant, and not of the company."

*Preferred Life,* 155 So. at 189.

This Court finds that the Mississippi Supreme Court would rule that an insurer cannot be held bound by a selling agent's actions

426

and knowledge when he is acting in collusion with the insured to mislead the company. Mr. Parker and Mr. O'Brien colluded to overinsure Mr. O'Brien by giving State Life and the other companies untrue and misleading information. State Life is not bound by Mr. Parker's knowledge.

**3. The argument of State Life That the Actions of Mr. O'Brien in Procuring Several Disability Policies in Excess of His Income Are Against Public Policy.**

State Life argues that it is against the public policy of the State of Mississippi for a person to overinsure himself and that this is an additional ground for the Court to void the policy. Since the Court has already declared the policy in question in this case to be void for other reasons, it is not necessary to decide this issue.

## *CONCLUSION*

The State Life policy at issue in this case is void because Frank O'Brien made material misrepresentations in his application for that policy. A separate Declaratory Judgment will be entered in favor of State Life in accordance with Rule 58 of the Federal Rules of Civil Procedure.

SO ORDERED.